**LANCASTER et al. v. ALLEN.   (No. 2417.)**

(Court of Civil Appeals of Texas. Texarkana. May 24, 1921. Rehearing Denied June 2, 1921.)

**1. Trial ⬅⟶352(1)—Special issue of railroad's violation of federal rule as to safety of locomotive wheel held proper.**

In an action under the federal law for the death of a fireman when the locomotive became derailed, a special question whether the flange on a wheel had a flat vertical surface, when tested by the rule prescribed by the Interstate Commerce Commission, required the jury to find that the measurement of the flange was made by the metal gauge required by the rule of the commission, and was not erroneous as permitting recovery based on opinions of witnesses notwithstanding the wheel conformed to the standard.

**2. Master and servant ⬅⟶286(12)—Railroad's negligence in violating federal rule as to safety of locomotive wheel held for jury.**

In an action under the federal law for the death of a locomotive fireman when the engine was derailed, evidence on behalf of plaintiff that the flange of the wheel was defective, and that a plaster cast of the wheel when measured by the gauge prescribed by the Interstate Commerce Commission rule showed it to be defective, *held* to raise the issue of defendant's negligence in using a wheel which was defec-

tive when tested by the gauge, notwithstanding evidence of defendant's witnesses to the contrary.

**3. Witnesses ⬅⟶252 — Plaster cast of wheel held sufficiently identified to be used as basis of measurement.**

A plaster cast is sufficiently identified as that of the locomotive wheel alleged to have caused the derailing of an engine and the death of a fireman by testimony of a witness that he saw the plaster cast taken off of the wheel in controversy, to make it the basis of testimony by the witness that the wheel was defective as shown by a gauge measurement of the cast.

**4. Master and servant ⬅⟶297(4)—Special findings held to show railroad's negligence under federal safety rules as to locomotive trucks.**

In an action under the federal law for the death of a locomotive fireman, an answer to the special question, stating that the reason for the flange on a locomotive wheel being worn was that the truck was out of tram, is a finding that the truck was out of tram, which, when sustained by the evidence, is sufficient to show the master's negligence, under the rule of the Interstate Commerce Commission, requiring trucks to be maintained in a safe and suitable condition for service.

**5. Death ⬅⟶67 — Evidence of deceased fireman's chance of promotion admissible.**

In an action for the death of a locomotive fireman, brought under the federal law, evidence that deceased was in line of promotion from fireman to engineer is admissible on the issue of damages.

Appeal from District Court, Harrison County; P. O. Beard, Judge.

Action by Mrs. Clara Allen, administratrix, against Lancaster and Wallace, Receivers of the Texas & Pacific Railway. Judgment for plaintiff, and defendants appeal. Affirmed.

T. O. Allen was a locomotive fireman in the employ of the receivers of the Texas & Pacific Railway, and while operating a passenger train was killed by the derailment of the engine, occurring near the station of Texarkana on September 5, 1917. The railway, as an admitted fact, was operated as an interstate carrier, and the passenger train was a through train, and was engaged in interstate commerce at the time T. O. Allen, operating it, was killed. The appellee, his widow, was appointed administratrix, and brought the suit for damages resulting to her and the children by reason of the death of T. O. Allen. The negligence proximately causing the death as alleged was (1) that the switch points or switch rails at the place of derailment were out of line, worn, old, and broken; (2) that the flange of the right-hand lead wheel of the truck in the front of the engine was worn to a flat vertical or sharp surface one inch or more from the tread of the wheel, causing the wheel to climb the rail of the track and

derail the engine; that the use of the wheel in this condition was in violation of the rules and regulations established and promulgated by the Interstate Commerce Commission as a standard of safety of locomotives and their appurtenances engaged in interstate commerce under authority of the Safety Appliance Act approved February 17, 1911 (U. S. Comp. St. §§ 8630–8639), and as amended by Act approved March 4, 1915 (U. S. Comp. St. §§ 8639a–8639d), and (3) that the front truck of the engine, and the wheels of the truck, were "out of tram," or not squarely or properly adjusted, to the extent of causing the front wheel to press and grind the flange against the rail, proximately causing it to climb the rail at the switch, or curve, and derail the engine.

The defendant specially denied (1) any negligence, and (2) that the track caused the derailment by being out of line and not in good condition, and (3) that the truck or the wheels were worn or out of tram, and (4) that the flange on the wheel of the truck of the engine was worn so as to be defective and not in compliance with the standard and the orders of the Interstate Commerce Commission and the federal statute.

The controversy arising in the evidence was (1) whether or not the flange in the wheel was in compliance with the rules and instructions for inspection and testing locomotives and their appurtenances established and fixed by order of the Interstate Commerce Commission in conformity with the acts of Congress, and (2) whether or not the circumstances went to show that the front truck of the engine and the wheels of the truck were "out of tram," or not squarely or properly adjusted, to the extent of causing the front right-hand wheel to grind and press against the rail, proximately causing it to climb the rail at the switch, or curve, and derail the engine.

The following rules, as adopted by the Interstate Commerce Commission, were offered in evidence:

"Rule 146. Forged Steel or Steel-Tired Wheels.

"(a) Forged steel or steel-tired wheels with any of the following defects shall not be continued in service:

"(b) Loose wheels; loose, broken or defective retaining rings or tires; broken or cracked hubs, plates or bolts.

"(c) Slide flat spot 2½ inches or longer; or if there are two or more adjoining spots, each 2 inches or longer.

"(d) Defective tread on account of cracks or shelled out spots 2½ inches or longer, or so numerous as to endanger the safety of the wheel.

"(e) Broken flange.

"(f) Flange worn to fifteen-sixteenths inch above the tread, or having flat vertical surface one inch or more from tread; tread worn five-sixteenths inch; flange more than one and one-half inches from tread to top of flange or thickness of tires or rims less than shown in figures 4, 5, 6, and 7.

"(g) Wheels out of gauge.

"Note. The determination of flat spots and worn flanges shall be made by a gauge as shown in figure 8."

In this connection it was shown that there was a prescribed metal gauge adopted and used in measuring the wheel and the flange in order to determine whether or not the wheel and the flange met the requirements of the several subdivisions of the rule. The wheel in question was shown to be a steel wheel. Subsection "f" is the section that is in question in the case.

"Rule 143. (a) Trucks, leading and trailing. Trucks shall be maintained in safe and suitable condition for service. Center places shall fit properly, and the male center place shall extend into the female center place not less than three-fourths inch. All centering devices shall be properly maintained.

"(b) A suitable safety chain shall be provided at each front corner of all four-wheel engine trucks.

"(c) All parts of trucks shall have sufficient clearance to prevent them from seriously interfering with any other part of the locomotive."

The special issues submitted by the court and the answers of the jury thereto are as follows:

"Question 1. Did the flange on the right-hand lead truck wheel have a flat vertical surface one inch or more from the tread of the wheel when tested by the rule prescribed by the Interstate Commerce Commission? Answer: Yes.

"Question 2. If you answer question No. 1 'Yes,' then answer this question: Was the condition of the flange the proximate cause, or one of the proximate causes, of the derailment? Answer: Yes.

"Question No. 3. Was the flange of the wheel worn sharp or vertical? Answer: Yes.

"Question No. 4. If you answer question No. 3 'Yes,' then state the reason for the flange being worn or vertical. Answer: Truck out of tram; too much pressure on right lead wheel.

"Question No. 5. If you answer question No. 3 'Yes,' then answer this question: Was the sharp or vertical condition of the flange, if it was sharp or vertical, one of the proximate causes of the derailment? Answer: Yes.

"Question No. 6. Was the switch point in the track in a reasonably safe condition for use? Answer: Yes."

The amount awarded was apportioned by the jury to the widow and five of the children, but any recovery was denied the three adult children.

The engine of the passenger train was suddenly derailed and turned over, according to the evidence, at a point about 700 feet west of the Union Depot in the city of Texarkana; and T. O. Allen, the fireman, was scalded and bruised to the extent that he died within a few hours afterwards. The train was running at about 10 or 12 miles an hour. The

switch had been set for the train to go down track 22 to the station. As the engine, at the point of the switch, headed up track 22 the front right-hand wheels of the pony truck of the engine suddenly got off the rail; and the rear wheels, on hitting the frog of the switch, left the rail, and the engine then turned over on its side. Appellant's yard switchman testified:

"I had the switches set before the train was due. When the engine got in sight I gave the signal to come ahead. It passed me before it was derailed. I noticed fire from the grinding of the wheel on the rail under the truck of the engine. I knew it was unusual. I tried to catch the engineer's eye to give him a signal to stop, but he failed to look back. The engine ran about three engine lengths after I saw the fire flying under it, before it turned over. The engine turned over between track 21 and 22, and on its left side. * * * The engine was derailed about 12 or 14 inches from the points of the switch, headed up track 22, where I first found any marks. * * * There was no obstruction on the track where the engine was derailed. The switches were all properly lined up, and there was no cause there for the derailment."

It appears that the cause of the derailment was looked into about "twenty minutes after the engine turned over." The evidence strongly goes to show that "the right front pony truck wheel was the first wheel to get off the rail." Physical marks on the ball of the rail showed "kind of a cutting mark" that the flange of the wheel made on the top of the rail. The flange on this wheel showed "a worn flange, or vertical, sharp flange is the common term." And, as further said, "the bevel had worn off and it had become vertical, which would cause it to run off the track, as it did," and "the flange was worn just about to the center of the flange, half of it worn away, or nearly half." "A vertical flange" is, as shown, when "the flange becomes right-angle to the tread of the wheel." It was testified that "the flange on the other wheel was not bright." "The bright part is the part we call vertical." The witness Holloway testified:

"I was" for about seven years "clerk in the locomotive and car departments and storekeeper and wheel inspector. * * * A vertical or straight flange will not keep the wheel on the rail. Beveled flanges cause the wheels to move laterally around curves, whereas, if vertical, flanges have tendency to climb any defect on the rail and get off. In going around sharp curves, won't hardly stay on; they get off. I looked at the wheel at the time. I thought it had been worn out; thought it was a bad wheel. To my mind it was not a good wheel. In my judgment I did not think it was a good wheel to be a lead wheel under a locomotive, because the bevel had worn off and it had become vertical, which would cause it to run off the track, as it did. * * * I thought that was a condemnable wheel. * * * The flange was worn just about to the center of the flange; half of it was worn away, or nearly half. * * * I think the flange of this wheel was worn practically to the center line. That means half of the throat side worn away. The portion that was left was straight down, perpendicular to the tread of the wheel. * * * It should not wear to that center line; would be dangerous when it wears to center line, I would say. * * * I was present when the Master Car Builders' gauge was applied to the flange on that wheel. It lacked a very small fraction of coming down to the tread of the wheel. It was a very small fraction. It lacked about one-eighth of an inch of coming down to the tread of the wheel. The gauge did not go down completely. I did not measure how far it went down. It was approximately one-eighth of an inch until it got to the throat of the flange. I think it came up to the standard rules, according to all that discussion we had with the railway officials."

The witness Neville testified that he had experience "as a locomotive fireman, and run a switch engine and an engine on the road also." The witness further said he examined the wheel. He said:

"I examined a part of the flange of that wheel he showed me. I suppose I examined about eight inches of the flange—part of the circle of the wheel. The flange was worn. It was what I would call a sharp flange. I mean by a sharp flange, not one worn clear to the tip. I mean a flange where the bevel is worn in the throat. I mean a flange worn to a straight edge going up to where the flange comes down to tread of the wheel; the bevel practically worn off. * * * I never tested a flange with one of those gauges. I would consider a gauge more reliable than testing with the eye alone."

The witness Mayes testified:

"I went to Texarkana with Mr. Casey to examine the wheel. While I was there I saw a metal gauge for gauging wheel flanges applied to the wheel, just like the one you have in your hand. When the 'U' part of the gauge was applied to the flange it went over the flange. While I was there Mr. Casey made a plaster cast of the wheel. I was not right at the spot when he made the cast, because I was looking for an engine to come back around the 'Y.' I saw the plaster cast taken off; saw it applied to the wheel. The cast you hold in your hand is the plaster cast referred to. In applying the plaster to the wheel it extended over to the edge of the flange to the inside edge."

The plaster cast was before the witness at the time this testimony was given. The witness McKiernan, a division foreman, testified:

"You have what appears to be a plaster cast in your hand. If it is a correct cast of the flange there, it would be a condemnable wheel, and I would order it taken out if under my observation."

The witness McDermott, foreman of the shops, testified:

"The pattern, as shown by the plaster cast, shows a bad wheel. The pattern you have here shows a straight flange."

The evidence on the part of appellant strongly went to show that when the gauge was applied to the wheel itself it disclosed that the flange of the wheel was not condemnable under the rule.

There is evidence to show by circumstances that the front truck of the engine was, and had for some time been, out of tram, or not squarely or properly adjusted, to the extent of causing the front wheel to press and grind against the rail, and to cause the wheel in its worn condition to climb the rail at the switch or curve and derail the engine. The witness Faulkner, a wheel inspector and general foreman, testified:

"With the lead wheel flange wearing away to the extent it was, almost vertical down to the throat, if not quite so, and the other flange not grinding away, that truck would not be in good condition to operate. The two wheels ought to wear something about alike. If they did not it would show something wrong. With the wheel binding against the rail from any cause so as to wear the flange away, that binding would have a tendency, if it got to a worn switch point or chipped out or broken switch point, to climb the rail. If it come to any defect in the rail, it would be liable to climb it, and that would wreck the train."

The witness McDermott, foreman of the mechanical department, testified:

"The flange on the left front wheel was not worn as straight as the one on the right-hand side. Some of the things that make the flange wear straight is because they would not be in tram; that is, exactly square. That causes considerable pressure of the wheel against the rail. If the flange got worn bad enough it would cause it to climb the rail. Some of the things that make the flange on one end of the axle wear straight while the other would not, is because not in tram."

The witness Dogenhart, switchman, testified:

"I had the switches set before the train was due. * * * I noticed fire from the wheels grinding on the rails or trucks or something under the engine; that is the first thing I noticed of anything unusual. I merely saw fire flying from something unusual. The engine was derailed about 12 or 14 inches from the points of the switch. I noticed all the wheels. The flange on the right-hand front truck wheel was worn some, but, not being an expert, I could not tell whether it was worn to unsafety or not. It was worn so that it was not beveled like the wheel on the other side. * * * If the rails were too close together, that could have caused the derailment. If the lead truck of the engine had been improperly lined, this fact might have caused the derailment. I have never formed a conclusion of what caused the derailment."

There is evidence, we conclude, to warrant the findings of the jury and to support the judgment of the court.

Prendergast & Prendergast, of Marshall, for appellant.

S. P. Jones, of Marshall, for appellee.

LEVY, J. (after stating the facts as above).
[1] The court submitted to the jury, and appellant predicates error on the following question for answer:

"Did the flange on the right-hand lead truck wheel have a flat vertical surface one inch or more from the tread of the wheel when tested by the rule prescribed by the Interstate Commerce Commission?"

Rule 146, § f, being "the rule" referred to in the instruction, provided that "steel-tired wheels," like the one in controversy, "shall not be continued in service" with "any of the following defects:" of "flange," as claimed in this case, "having flat vertical service one inch or more from tread." And the question required the jury to determine from the evidence whether or not "the flange on the right-hand lead truck wheel" was, in point of fact, in a prohibited condition for use in the service, "when tested by the rule prescribed by the Interstate Commerce Commission." The rule was in evidence before the jury, as was also the regulation requiring that the determination of worn flanges shall be made by a prescribed metal gauge or measurement; and the metal gauge was introduced in evidence, and witnesses testified respecting whether or not the flange of the wheel in controversy was defective when the metal gauge was applied to it. The language of the question permitted, and the jury could reasonably understand, that it required them to consider all the evidence respecting the metal gauge and the measurement of the flange of the wheel by the metal gauge in determining whether or not the condition of the flange violated the plain provision of the rule. It did not exclude from the consideration of the jury, as contended by appellant, the measurement of the flange by the metal gauge. The term "when tested by the rule," as used, includes and refers to the method of measurement adopted and required, and was intended to have that restrictive meaning. It is believed there was no reversible error in the charge, and assignments Nos. 2 and 4 are overruled. Lancaster v. Allen, 110 Tex. 213, 217 S. W. 1032.

[2] The appellant requested and complains of the refusal of the court to give the following special charge:

"In this case it appears without contradiction that the flange of the wheel on the engine in question complied with the standard established by the Interstate Commerce Commission under the act of Congress, and therefore the jury cannot find that the railroad company was negligent in that regard."

The evidence raises the issue, we conclude, of the flange of the wheel in evidence being in a condition prohibited by the rule established by the Interstate Commerce Commission. Appellant showed by several witnesses that the flange of the wheel, when the metal gauge or measurement was applied, met and was within the requirement of the rule. Appellee, though, showed by several witnesses that in their opinion, from an actual observation and examination of the wheel, though not tested by the metal gauge, the wheel was condemnable under the rule. And the appellee, following this testimony, then showed by the evidence of the witness Mayes that a plaster cast was taken of the wheel. The witness said: "I saw the plaster cast taken off; saw it applied to the wheel. The cast you hold in your hand is the plaster cast referred to." And then appellee offered several witnesses, who testified that the plaster cast, when the metal gauge is applied to it, shows a flange condemnable and prohibited by the rule.

[3] The plaster cast was sufficiently proven to make it the basis of having the witnesses testify that it showed by measurement of the metal gauge that the wheel of which it was a cast showed a condition prohibited by the rule. Assignments Nos. 1 and 3 are overruled.

[4] The appellant challenges questions and answers Nos. 3 and 4. In view of the pleading and evidence, the effect, we think, of these answers, and the real meaning to be given, is a finding by the jury that the "truck" of the engine was "out of tram," making "too much pressure on the right lead wheel" to the extent and degree, in point of fact of wearing the flanges of the wheel "sharp or vertical," proximately causing the derailment. It was alleged, and the circumstances of the case went strongly to show, that the front truck of the engine was "out of tram," or not properly adjusted, and by reason thereof had caused the front wheel to grind against the rail long enough to wear the flange to the extent that it would easily climb, as it did, the rail on a sharp curve, as in evidence, causing derailment. When the engine passed the yard switchman, just before derailment, he saw "fire from the grinding of the wheel on the rail." And this finding of fact would, of itself, support the judgment in this case. Rule 143 of the Commission provided that "trucks shall be maintained in safe and suitable condition for service." The wheel being worn is merely a result of the "truck being out of tram," as found by the jury; and the liability, in this phase of the case, would arise, not upon the condition of the wheel, but upon "the truck" being in a condition not authorized by the rule of the Commission, and thus proximately causing the derailment. Assignments of error Nos. 5, 6, and 8 are overruled.

[5] The tenth assignment of error predicates error upon allowing appellee to prove, over objection, that the deceased was in line of promotion from fireman to engineer. The proposition is:

"The chance of a locomotive fireman 45 years old to a promotion to a position with a better salary is too speculative, remote, and uncertain to be the basis for increasing the damages to be found by the jury caused by his death."

The evidence shows that deceased was in line of promotion. This evidence has been permitted under the rule in Texas, and no reason is perceived why it should not apply simply because the instant case is a cause of action arising under the law of Congress. The assignment is overruled.

We have considered each of the remaining assignments, and concluded that they should be overruled. Assignments numbered 7 and 11 to 17 inclusive are overruled.

The judgment is affirmed.