## LYNCH v. DELAWARE, L. & W. R. CO.
### No. 321.

Circuit Court of Appeals, Second Circuit.
May 9, 1932.

Douglas Swift, of New York City, for appellant.

Alfred T. Rowe, of New York City (Sol. Gelb and Anthony Sansone, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Lynch, the deceased, was the engineer of a locomotive, used to pull a train upon the defendant's road, and concededly engaged in interstate commerce at the time he was killed. His administratrix sued for a violation of the Boiler Inspection Act (45 USCA § 22 et seq.), because of the defective condition of an "injector" or "inspirator" upon the locomotive, which forces the water from the tank into the boiler. The only issue necessary for our decision is whether there was enough evidence to submit to the jury. The boiler of the locomotive exploded because the water got too low, and the water fell because the only injector in operation at the time did not feed enough water into it. If this was proved to be due to a defect in the injector, the judgment was right, barring putative errors in the charge, which we pass; otherwise, it was not.

The plaintiff relied upon the testimony of three witnesses. Two were standing beside the track when the train passed on an upgrade, pulled by two locomotives of which Lynch's was the first. These witnesses saw him standing on the steps of the right side of his cab and apparently looking at his injector from which water and steam were escaping. The third witness, Harle, was the engineer of the locomotive behind; he saw Lynch stand for about three-quarters of a minute on the steps of his cab looking at his injector, and he, too, saw water and steam escaping. Lynch went back into his cab; the water and steam stopped, and the locomotive was eased off for about four miles. Within two miles after it had been again put at full power, the boiler exploded.

The injector is so set that the water will flow into the body of it from the tank by gravity. Steam both regulates the amount of water fed and lifts it to the boiler above. The feed is controlled by means of a pipe which runs from the boiler and mixes steam with the water; just how this regulates the amount fed to the boiler is not clear, and it is not important to know. The amount of steam let in through this pipe is governed by a valve which is manipulated in the cab. After the proper mixture is made it is lifted to the boiler by steam from a second and larger pipe, the amount of which is also controlled by a valve operated from the cab. It is, however, necessary that in the initial phase the injector should itself be open to the air; for this purpose it has an overflow valve also controlled from the cab. In operation the engineer first opens the overflow valve and water spills to the ground from the body of the injector. He then opens the regulating valve and makes the proper mixture for the feed he wishes; the mixture also spills. Then he opens the valve in the larger pipe and last of all closes the overflow valve. The injector thereafter pumps as much water to the boiler as the regulating steam pipe allows. During the period when the over-

flow and the regulating valves are open, the mixture comes out as water and "steam" or "vapor"; the witnesses used either word indifferently.

From the plaintiff's testimony in the setting described it appeared that Lynch had found trouble with the feed of his boiler and stepped down to see whether the injector was working as it should. To do this apparently he opened the overflow valve. Although Harle was somewhat vague as to whether he had not seen the escape of water and steam some time before Lynch stepped down, a jury might have found that he had not; it was consistent with his testimony that Lynch had opened the valve just before he left his cab. He closed it when he got back, and it was in working order because the flow stopped. He allowed the boiler to be fed for four miles and then assumed he had enough water, though in fact he had not; and this would have been apparent to him had he looked at his water gauges, unless they showed more water than existed, something not suggested, and too conjectural to be the basis of a verdict.

From all this nobody could conclude that the injector was not working properly. That is indeed a possibility; there might have been some check in the pipe leading to the boiler or in the steam pipes which made or lifted the mixture; though there could hardly have been any in the supply from the tank, for Lynch had been satisfied with the mixture which he saw spilling. But there is also the possibility that he had not opened the regulating valve enough. The defendant introduced evidence that after the explosion it had been found only one-third open, not admitting enough water. The plaintiff answers that the jury was not obliged to believe the witness, and for argument we may so assume. Still the evidence of any defect remains equivocal. To tilt the scales she argues that Lynch was an experienced man who would not have failed to open the regulating valve at a time when he wanted water. There would be more force in this were it not that, as we have said, he certainly did put on full power when the water was too low, as he could have known; in that particular he was certainly inattentive. The only premise which requires the conclusion that there was some defect in the injector, that is, the unlikelihood that he would not properly manipulate his valves, is thus seriously impaired, and in any event there remains no shred of affirmative evidence that the injector was not in proper working order. Indeed, there was much testimony that it was. It had been examined in June by servants of the Interstate Commerce Commission; had had at least routine inspection that very day; and so much of it as was left after the explosion was found to be fit. Furthermore, the defendant also proved that Lynch had not used the alternate injector for emergency. Without passing on the power of the jury to reject all this testimony, it is an unwarranted assumption that Lynch could not have neglected what the defendant's witnesses said he had; it did not prove that the injector was defective.

To supply this the plaintiff tried to show that the evidence of escaping steam itself showed a defect; but to do so she was obliged to pervert the testimony of the defendant's witnesses. Several of these said that the escape of steam would be very unusual; and of course it would, if it were steam alone. That is what they plainly meant. All the eyewitnesses saw water as well as steam; and obviously Lynch was not concerned by what he found, for he closed the overflow valve and assumed that his boiler was being fed. Nor is there any substance in the distinction attempted to be drawn between "steam" and "vapor." Harle described it as steam, and saw nothing unusual in it; so did McDonald, one of the men whom Lynch passed. Scott, an expert for the plaintiff, spoke of "steam" as a normal phenomenon when the overflow valve is open. Those of the defendant's witnesses who were more guarded in their choice of words preferred to call it "vapor," though they usually added that it looked like steam. The fancied distinction has no reality, is no more than a straw to save a case which was too speculative. Recent decisions of the Supreme Court (Southern Ry. v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. —; Atchison, T. & S. F. Ry. v. Saxon, 284 U. S. 458, 52 S. Ct. 229, 76 L. Ed. —) admonish us that we are not in such cases to allow recoveries upon flimsy conjecture beyond the range of solid inference. The evidence is at best no more than evenly balanced, and the plaintiff therefore failed to make out a case. New York Central R. R. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; Burnett v. Pennsylvania R. R., 33 F.(2d) 579 (C. C. A. 6).

Judgment reversed; new trial ordered.