LENA M. FRYER, Administratrix of the Estate of HILRY N. FRYER, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—63 S. W. (2d) 47.

Division One, August 24, 1933.

*E. T. Miller* and *Mann, Mann & Miller* for appellant.

*Hamlin & Hamlin* and *Sizer & Gardner* for respondent.

HYDE, C.—This is an action based upon violation of the Federal Boiler Inspection Act, U. S. C. A., Title 45, Chapter 1, Section 23. Plaintiff's petition was in two counts, the first, for damages for the death of her husband, the second, for damages for his conscious pain and suffering. Plaintiff's petition pleaded the facts concerning his injuries, as follows:

"3. Plaintiff's said husband, in the line of his duties and in the

744

course of his employment, left the defendant's terminal at Springfield, Missouri, for Muskogee, Oklahoma, as engineer on locomotive engine No. 384, then and there being used and operated by defendant in pulling its westbound passenger train No. 1 between Springfield and Muskogee aforesaid; that said engine No. 384 was a large passenger engine, and was equipped with a reverse lever located near the engineer's seat box, for use by the engineer in handling and controlling said engine and the speed and power thereof; that said lever was a large steel bar, four or five feet in height, set in a perpendicular position, with a quadrant with notches thereon for holding said lever in proper position, so that when it became necessary for said lever to be moved either forward or backward on said quadrant it was necessary for the engineer to release the catch on said lever and the attachments thereto from the notches in said quadrant, by taking hold of said lever with his hand or hands, at the top end thereof; that said lever was located immediately back of the head of the boiler, and was so constructed that the same could be moved either backward from, or forward towards the head of the boiler, and had to be so moved in the operation of said locomotive.

"4. Plaintiff further states that said locomotive was equipped with a Baker valve, which was attached to said reverse lever at the lower end thereof and which was a part of the appurtenances and appliances of said locomotive and boiler; *that said :Baker valve was attached directly to the valve stem, and connected with said reverse lever, so that when said locomotive engine was in operation and working steam and pulling its load there was an immense pressure directly against and upon said lever, so that while said locomotive was in operation and pulling its load, said lever when released from the notches in the quadrant, by the engineer,* as aforesaid, on account of the pressure and force exerted thereon by reason of the Baker valve arrangement as aforesaid, and by reason of its defective and unsafe condition, *would suddenly move and jump forward with great force and violence.*

"5. Plaintiff states that said locomotive engine was not equipped with an air reverse, as such engines are customarily, and should be, equipped; that an air reverse is an attachment or appliance modern and in customary use on locomotives, which if attached to the Baker valve appliance and lever, controls and operates said lever by air, so that when the same is released from the notches in the quadrant aforesaid, the movement of said lever forward or backward is controlled and held in check by means of an air valve, so that the same will move steadily, easily and under control of the engineer; but *when not so equipped with an air reverse, the said lever when released from its notches upon the quadrant aforesaid, will as heretofore stated, move and jump forward with great force and violence while said locomotive engine is in operation and pulling its load;* (and

particularly will move suddenly and jump forward with great force and violence when the Baker valve attachment is defective and out of repair, as herein set out). (Italics and parentheses ours.)

"6. Plaintiff states that on the early morning of said date, while her said husband was running and operating said engine No. 384, as the engineer thereof, pulling defendant's fast westbound passenger train No. 1, and when the same reached and was upon a certain hill or grade in defendant's track near Verona, Missouri, it became necessary in the course of operation of said engine for plaintiff's said husband to move said lever; and in order to move the same either forward or backward it was then necessary for plaintiff's said husband to release said lever from the notches in the quadrant thereof; and plaintiff states that while her said husband was seated upon his seat in the cab of said engine, with his feet projecting towards the head of the boiler, and while said locomotive engine was running and pulling its load, he thereupon took hold of the upper end of said lever with his hand, or hands, and released same from one of the notches in said quadrant so as to move said lever; and plaintiff states that when he did so, by reason of the force, pressure and power exerted upon said lever as aforesaid by said Baker valve, and by reason of its defective and unsafe condition as herein set out, the same was thereby instantly moved and jerked forward with great force and violence, while plaintiff's said husband had hold of same with his hand, or hands, so that then and thereby the upper portion of the body of plaintiff's said husband was suddenly and violently jerked forward by said lever while he was seated as aforesaid in the engineer's seat, and that the said lever struck and caught one of his legs between said lever and the boiler head." (Plaintiff seems to plead that, if not equipped with an air reverse, the lever would jump forward whether defective or not.)

The petition then makes five separate charges of negligence, four of which relate to the failure to have the engine equipped with the air reverse attachment above described and the other being as follows:

"(b) And, in that said Baker valve attachment was defective and the valves thereof were defective, insecure and unsafe, and were not in proper working order; which said defects and insufficiencies thereof cannot be more specifically set forth herein because the same are unknown to this plaintiff."

Defendant moved to have the petition made more definite and certain to point out what defects were claimed other than the failure to have an air reverse. After this motion was overruled, defendant answered setting up both a general denial and affirmative defenses. When it came to submitting the case, plaintiff abandoned all of its assignments concerning the failure to equip the engine with the air reverse attachment and in instructions hypothesized as negligence

which authorized a verdict for plaintiff, if her husband's death resulted therefrom, the following:

"And if you further find *that the said reverse lever gears, valves, attachments and bearings thereof were then in a defective condition,* and that by reason thereof when the deceased released and undertook to move said reverse lever, the same suddenly jumped forward and caught and broke the deceased's leg, and otherwise injured him; and, if you further find and believe from the evidence that by reason (*and on account of the defective and inoperative condition of said locomotive,* as aforesaid, if you find the same was in a defective and inoperative condition, the *said locomotive was not in proper condition and safe to operate*) in the service and use to which the same was then being put; then the defendant was guilty of negligence." (It is obvious that if a thing is in a defective condition it is not in a proper condition, but how can there be a defective condition without a defect? That seems to be the missing link in this case.)

The jury's verdict was for plaintiff on the first count for $10,000, and on the second count for $5,000. From the judgment entered thereon, defendant has appealed. Apparently, the events leading up to the injury of engineer Fryer were about as related in the petition. However, plaintiff's evidence only showed that the fireman in the engine with Fryer was sanding the engine with his back turned to him; that the train was going up a hill, running from forty-five to fifty miles per hour, when he heard Fryer cry out "Oh;" and that he turned and saw Fryer in his seat, on the right side of the engine cab, where he had been before the fireman turned away, with the inside of his left foot against the boiler head and the reversed lever against his ankle, holding it against the boiler head. The fireman tried to pull the lever back but could not do so, until they slowed the train down to about twenty miles per hour. Fryer's ankle was broken, but he ran the engine to Monett, a distance of six or eight miles from where he was injured and forty miles from Springfield. There he was relieved by another engineer. The fireman further testified that Fryer had moved the lever forward on hills, on this trip, four times before the acident, and that "it didn't go in the corner or get out of control in any way." The engineer who relieved Fryer, thereafter, on the run, also had occasion to move the reverse lever forward to maintain speed while traveling up grade south of Venita, Oklahoma. The train was then running from fifty to sixty miles per hour and, knowing about Fryer's accident, this engineer had the fireman help him attempt to move the lever a few notches. They both said that they were unable to hold it and that it went all the way forward, or as they described it, "it went over in the corner with us." They could not move it back until they slowed the train to about twenty miles per hour. The fireman "looked over this engine at Monett . . . examined this valve

and the reversed lever and did not find anything worn or defective about those parts." He said it is the engineer's duty to watch the lubrication and that *"if the valves become dry, that will affect this reverse lever going in the corner,* it will make it harder to control." The relief engineer looked the engine over at Muskogee and "did not find any evidence of anything to indicate any broken or worn or defective part of this reverse gear or any part that the lever operates with." He also said: "It is only when operating at a very high rate of speed and because of the pressure of the steam in the cylinders that will cause this reverse lever to get away from you. That can be caused by the engineer's failure to properly lubricate the valves. That will do it. The engineer has control of the lubrication of the valves . . . *If the engineer fails to get oil to those valves and they become dry he will have trouble with the reverse lever on any engine."*

In addition to the testimony of this engineer and fireman, plaintiff had the testimony of a discharged locomotive inspector of defendant. He explained that an engineer, in order to maintain his speed up grade, would move the reverse lever forward two or three notches, which would let more steam into the cylinders by increasing the valve openings; that this was similar to changing gear, going from second to low, in operating an automobile; that the reverse lever was operated like the emergency brake of an automobile; that the lever was connected with the valve by a number of rods with connections and bearings on each side of the engine; and that "there are ten or twelve connections and bearings in this reverse lever and its attachments that work and operate when you move this lever." He then testified, concerning the cause of the unusual movement of the reverse lever observed by the engineer and fireman, as follows:

"Q. I will ask you to state what will cause the reverse lever to jump forward and go in the corner, as you call it? A. Well, the main cause would be wear in those bearings. Q. To what extent will these bearings have to become worn, these ten or twelve bearings, in order to cause this reverse lever to go forward while the train is being operated? A. Just a very small amount of wear from one-sixteenth in each bearing; with eight or ten bearings, in eight bearings would give you around eight-sixteenths inches, just could be in the excess motion. The excess motion would be in the bearings of the gears; and, in operating this lever with this lost motion would cause the lever to jump forward, where the lost motion and wear was in the bearings."

There was no testimony whatever by anyone that any of the bearings referred to on this engine were worn. Plaintiff's expert was not asked about their condition (evidently he had not examined them) and the fireman and engineer, plaintiff's only other witnesses, said they did not find them worn and could find no defective condition

of any part. They both said that failure to get enough oil to the valves would cause what occurred. Defendant showed, by the engineer who made a round-trip between Springfield and Muskogee with the same engine on October 26 and 27, 1926 (Fryer was injured October 29, 1926), that the reverse lever and valve gear was in good condition; that he had no trouble in operating it; that he inspected the engine then; and that he did not find anything wrong, defective or out of repair about these bearings. He said "they were not worn when I brought the engine into Springfield." Defendant also showed by engineer Fryer's locomotive inspection report, made upon the completion of his first run from Springfield to Muskogee on October 28th, that he reported the condition of various parts of the engine as good; that, in his statement of repairs needed, he made no requirement concerning the reverse lever, valve gear and attachments; and that this was also true of the report he made at the end of his run back to Springfield on October 29th. It was shown by the locomotive inspector, who inspected the engine at Springfield on October 29th before the start of the run during which Fryer was injured, that engine was in good condition and that he found nothing wrong with these parts. It was shown, by other employees at the Springfield shops, that engineer Fryer made no verbal statement or complaint, in addition to his written report, about any part of the engine. It was shown by the round house foreman and his assistants at Muskogee that they inspected the engine on October 30th at the completion of the run upon which engineer was injured; that "everything worked perfect;" that "there was no excess play in any of the bearings;" that they "did not find any bearings on the connections which were worn;" and that they "found nothing out of the ordinary or unusual in the condition of the valve gear or the reverse lever of this engine." It was further shown by the engineer who operated the engine on this run after engineer Fryer's injury, during the first part of November, that he "found no trouble or anything wrong or out of repair with the reverse gear or the valve gear or reverse lever on that engine" and that he "never had a bit of trouble with it," although he advanced it while running at high speed on grades.

Defendant's chief mechanical engineer testified that worn bearings could not cause what occurred because the counter balance spring would overcome that. He said the only thing which could cause the reverse lever to jump forward into the corner would be valve sticking, due to insufficient lubrication, and it was the engineer's duty to properly lubricate the engine. He explained this, as follows:

"The main valves are lubricated by an oil line running from the engineer's cab back to the cylinder, to the steam chest, which is controlled by the engineer; but, the engineer controls the movement of the drops that go to the valves. The engineer can see that it is feeding. He sets that for a certain number of drops to drop out

of the lubricator for each oil line; and, that is visible to him. There is a little glass on the lubricator showing it; a bull's eye. That is the later type of lubricator which all roads have; a glass indicating the oil dropping.''

As to how the engineer might prevent, temporarily, the oil from reaching the valves, he said:

''One cause might be from an engineer working his throttle heavy, or a short cut-off which creates a greater pressure in your steam chest than you have in your oil line—it should be about ten or fifteen per cent difference in over that—and it would probably create a difference of twenty-five or thirty per cent, maybe more; and, that would hold this oil back; and, that might happen until he changes his throttle or reverse lever; and he could clear it up further on and wouldn't give him trouble. And another cause, he might have been drifting his engine, which creates a vacuum form of gas through his cylinders, through his valve. That will dry up the lubrication; and, the carbon and soot would absorb the oil. . . .

''The oil that gets into the valve proper is the oil that goes through this lubricator, going up by drops. The engineer can see that going through there. When it goes out of sight in the glass, the engineer cannot see that oil any more but he knows where it should go. It can't go anywhere except to the valves. If it doesn't it will stop feeding and back up on you. He will know it pretty quick. . . .

''Q. If the valves do become dry; and, if at the time the engineer attempts to change the reverse lever running at a rapid rate of speed, would it pull the reverse lever forward? A. Yes, sir. You have got about from five thousand to six or seven thousand pounds of steam probably jerking on that lever; something has got to happen.''

Defendant contends that its demurrer to the evidence at the close of the case should have been sustained because plaintiff failed to prove a violation of the Boiler Inspection Act. It will be noted from plaintiff's petition that *the only specific charge of violation of the act was, failure to have the engine equipped with an air reverse, which was abandoned* and as to which plaintiff offered no instruction. plaintiff admits that, under the decision of the United States Supreme Court in Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419, defendant did not violate the act, in not equipping the engine with an air reverse, since no rule of the Interstate Commerce Commission required it and since the same type of reverse lever on this engine was shown to be in general use on various railroads of the country. Outside of this complaint as to the air reverse, the petition only contained the shotgun charge or guess that there might have been some defect which plaintiff did not know of and could not find out about. Plaintiff's evidence and instructions were just as indefinite. Plaintiff, after abandoning her original theory that a failure to have an air reverse created a

condition which was a violation of the act, undertook at the trial to show that there were worn bearings which constituted a violation of the act. This attempt, also, as hereinafter shown, failed because there was no evidence of worn bearings. Plaintiff's position now is that it was not necessary to show that any particular defect existed, but only that some part of the engine failed to properly function, and that the showing that the reverse lever went violently forward in an unusual manner was therefore sufficient evidence that it was defective. To determine this question we must look to the act and the decisions of the Federal Courts construing it. *If plaintiff's position is correct, in a boiler explosion case all that it would be necessary for a plaintiff to prove, to show liability under the act, would be that the boiler exploded.* Therefore, a boiler explosion case would prove itself. But the Federal decisions do not so construe the Boiler Inspection Act.

It is true that a railroad's liability under the Federal Boiler Inspection Act, as under the Federal Safety Appliance Act, does not depend upon notice of defects or upon negligence. These acts are to be construed in connection with the Federal Employers' Liability Act (U. S. C. A., Title 45, Secs. 51-55). Violation of their requirements is the same as negligence *per se* and makes the employer absolutely liable to its employee for injuries resulting therefrom. The United States Supreme Court has recently construed the Boiler Inspection Act in the Groeger case, supra, saying that it "provides that it shall be unlawful 'for any common carrier . . . to use any locomotive engine propelled by steam power . . . unless the boiler . . . and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb. . . .' It imposes upon the carrier a higher degree of duty than theretofore existed. The requirement of the statute is substituted for the common-law rule which holds the employer to ordinary care to provide his employees a reasonably safe place in which, and reasonably safe appliances and machinery with which, to work. . . . Defendant's duty to have the boiler in safe condition to operate so that it could be used without unnecessary peril to its employees was absolute and continuing. No notice to the defendant, actual or constructive, of the defects or unsafe condition of the boiler was necessary to plaintiff's case. Defendant is liable if its breach of duty contributed to cause the death. . . . Defendant was bound absolutely to furnish what before, under the common law, it was its duty to exercise ordinary care to provide."

The Groeger case says further that the essential and ultimate question for the jury to determine is whether the boiler (and its appurtenances) was in the condition required by the act. *It certainly*

*does not hold that the fact that the boiler of Groeger's engine exploded was all the proof that was required* to show that the boiler was not in the condition required by the act. In that case, there was evidence that a brakeman "went into the cab of Groeger's engine, and that, while there, he observed that water and steam were escaping from the boiler into the fire box; that he heard the sizzling of the water upon the fire; that, when he opened the fire box door, steam gushed out; that the fire was dead; that the steam gauge showed 160 pounds pressure, and that water was being put into the boiler by the two injectors."

The court said as to the sufficiency of this evidence:

"If the boiler was in the condition he described (a condition which violated the Act), it would not be unreasonable to conclude that a breach of duty of defendant caused or contributed to cause the explosion. We think it did not conclusively appear that the failure of deceased to properly operate the engine was the sole cause of the explosion. It follows that the evidence made a case for the jury."

■ Therefore, *if plaintiff had shown here any defective condition which violated the act, her judgment would have to be affirmed (she could recover) unless it conclusively appeared that it was not the proximate cause* of the injury, as, for instance, that the engineer's improper operation was the sole cause. However, it will be noted that a defect in the boiler (a leak) which could have caused or contributed to the explosion causing Groeger's death was shown to exist in the Groeger case before the accident. That is the difference between the present case and the Groeger case. The evidence in this case fails to show that any defect existed in the bearings of the reverse lever gear (the only defective condition which plaintiff claimed could have caused the accident) either before or after the accident. In commenting upon the Groeger case this court, in Riley v. Wabash Railroad Co., 328 Mo. 910, 44 S. W. (2d) 136, quoted with approval from the opinion of the Supreme Court of New Hampshire in Watkins v. Boston & Maine Railroad Co., 138 Atl. 315, as follows:

" 'It is true, as the plaintiff contends, that the "essential and ultimate question—i. e., whether the boiler was in the condition required by the act"—is one of fact. [Baltimore & Ohio Railroad v. Groeger, 266 U. S. 521, 531, 45 S. Ct. 169 (173, 69 L. Ed. 419).] The claim that it is therefore one for the jury to decide is subject to the qualification that the *evidence must show a defect* which could be found to render the engine unsafe within the meaning of the act.' (Italics ours.) "

As we have stated, the Boiler Inspection Act makes the requirement that all parts of an engine shall be in proper condition and safe to operate. While this is an absolute duty, a violation of it must be shown to impose liability. A violation of it would be an improper condition which would make it unsafe to operate. To show a vio-

lation of this duty, must it not be shown that some defect existed which would or could make the condition of the engine improper and unsafe to operate? Showing that something happened which could have been caused by improper operation (failure to properly lubricate), as plaintiff's own evidence here shows (it in fact leaves no other way to account for it), without any evidence at all that a mechanical defect existed which could have caused what happened, is surely not sufficient. That is what the authorities say. "The mere · fact that an injury has resulted from some condition of a locomotive or a part or appurtenance thereof does not of itself show that the engine or its parts are not in proper condition and safe to operate." [2 Roberts, Federal Liabilities of Carriers (2 Ed.) 1250, sec. 654.] In every case, cited by plaintiff or which we have been able to find holding the evidence sufficient to show violation of the Boiler Inspection Act, there has been shown some existing defect in the locomotive or its appurtenances which could have caused the accident which resulted in an injury. In the Groeger case, as we said, there was a leak in the boiler,. which could have been the cause of the explosion. In Kilburn v. Chicago, Milwaukee & St. Paul Ry. Co., 289 Mo. 75, 232 S. W. 1017, there was a broken piston and cylinder head which caused an excessive amount of steam to escape into the place where plaintiff was working and this could have caused his injury.· In· Kidd v. Chicago, Rock Island & Pac. Ry. Co., 310 Mo. 1, 274 S. W. 1079, certiorari denied 269 U. S. 582, 46 Sup. Ct. 119, 70 L. Ed. 424, the main throttle and drifting throttle of the engine were both leaking steam badly and could not be shut off so that it became necessary to leave the cylinder cocks open, permitting an excessive amount of steam to escape and also the grates of the engine were out of order so that they could not be shaken, which made it necessary to turn on the blower to create sufficient draught for the fire, which made a loud hissing noise. It was also shown that this steam and noise made it impossible for defendant's employee to see or hear an approaching train by which he was killed when he stepped on the adjoining track to walk around the steam. In Drew v. St. Louis-San Francisco Ry. Co., 220 Mo. App. 720, 293 S. W. 468, the cylinder cocks of the engine were broken, allowing steam to escape and strike the ground with sufficient force to cause dirt and cinders to be blown into the engine cab, injuring plaintiff's eye. In Watkins v. Boston & Maine Railroad Co. (N. H.), 138 Atl. 315, there was evidence that the gangway apron between the engine and tender was loose and had too much play due to wear and use. A new trial was granted to submit the question of whether this was a sufficient defect to violate the act, but it was held improper following the Groeger case, to submit the question of whether a failure to furnish chains, as new equipment to hold the apron secure, violated the act. In Gerow v. Seaboard Air Line Ry.

(N. C.), 128 S. E. 345, certiorari denied 269 U. S. 584, 46 Sup. Ct. 121, 70 L. Ed. 425, there was no strainer over the intake of the tender so that trash got into the tank and thence into the tank hose leading to the injectors. It was shown that as a result of this, the strainers in the tank hose had been clogged with trash so as to stop the flow of water from the tank to the boiler through the injectors and that this caused the explosion. See, however, Lynch v. Delaware, L. & W. Railroad Co. (C. C. A.), 58 Fed. (2d) 177, where the evidence failed to show any such condition and the contention was that a defective condition of the injectors could be inferred from the explosion of the boiler which could have been caused by defective injectors. The court held such evidence insufficient to make a jury case. In Thornton v. Minneapolis & St. Louis Railroad Co. (Iowa), 175 N. W. 71, the valve of the blow off cock would not close and the discharge pipe was not securely fastened so that the pressure of steam drove the discharge pipe out of its position and threw it against plaintiff causing his injury. It was shown even by defendant's witnesses that they found the blow off cock and clamp loose. In Fry v. Chicago, Rock Island & Pacific Railroad Co. (Minn.), 195 N. W. 629, certiorari denied 263 U. S. 723, 44 Sup. Ct. 231, 68 L. Ed. 525, the handle of the pin lifter of a switch engine was in such a position when not in use as to endanger men attempting to alight from the footboard of the engine by catching their clothing. [See, also, Great Northern Ry. Co. v. Donaldson, 246 U. S. 121, 38 Sup. Ct. 230, 62 L. Ed. 616 (defective button heads on crown sheet bolts for oil burning engine); Hines v. Smith, 275 Fed. 766 (automatic bell ringer was out of order and would not ring the bell); Schaff v. Perdue (Tex.), 254 S. W. 151 (failure to clean boiler and cracked crown sheet bolts; Lancaster v. Allen (Tex.), 231 S. W. 148 (weak and insecure crown sheet bolts and stays).]

Here, plaintiff's evidence only tends to show that the lever jumped because of a temporary stoppage of the flow of oil and does not show an improper condition of any mechanical part. It is, of course, possible under some circumstances, that the happening of an event may be evidence of its cause. ▮ An event may be evidenced circumstantially by a cause or by an effect. [McDonald v. Kansas City Gas Co., 332 Mo. 356, 59 S. W. (2d) 37.] Showing an event occurs, however, does not always necessarily show that a defective condition caused it to happen. The ancient Ford (like the Missouri mule) often kicked without apparent cause, and without mechanical defect, when we cranked it. The question here is not how plaintiff must prove that an improper condition existed. The trouble with her case is no proof of it at all. Plaintiff relies upon coupler cases, where it has been held that a showing that the automatic coupler failed to couple or stay coupled is sufficient to show a violation of the Safety Appliance Act. [Chicago, Rock Island & Pacific Ry.

Co. v. Brown, 229 U. S. 317, 57 L. Ed. 1204; San Antonio Railway v. Wagner, 241 U. S. 476, 60 L. Ed. 1110; Minneapolis & St. Louis Ry. Co. v. Gotschall, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995; McAllister v. St. Louis Bridge Terminal Railroad Co., 324 Mo. 1005, 25 S. W. (2d) 791.] The Safety Appliance Act, however, requires cars to be "equipped with couplers coupling automatically by impact." [U. S. C. A., Title 45, sec. 2.] The question of compliance with that act is simple; the couplers either couple or they do not couple. Of course, if the coupler on any car fails to couple so that it would remain coupled, it does not couple as required by the act and therefore a showing that it opened, so as to let the cars part, would show the violation of the act. The same thing would be true under Section 4, requiring that cars be "provided with secure grab irons or handholds in the ends and sides of each car." If a grab iron does not hold a man it is not secure. Therefore, if it is shown that a grab iron gave way with a man who attempted to use it, that would be sufficient to show that it was not secure. What could show it more conclusively? Likewise, the violation of section 5 can be definitely ascertained by measurement. Drawbars must be of standard height or they violate the Act. [St. Louis, Iron Mountain & Southern Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061.] See, also, Section 11, requiring "efficient hand brakes," which means to maintain secure hand brakes. [Henry v. C. C. C. & St. L. Ry. Co., 332 Mo. 1072, 61 S. W. (2d) 340, and cases therein cited.] Therefore, if a brake chain breaks, as in the Henry case, the brake has not been maintained secure and the act is violated. In the present case nothing broke, nothing was even worn or loose, and there is no evidence pointing to any mechanical defect in any part to show that it was, in any way defective. All these provisions relate to more specific, more definite and more easily ascertained conditions than that stated in the Boiler Inspection Act. These situations are therefore different than the one here, although the absolute liability for violation of each is exactly the same.

The question here is: Was there any improper condition of the reverse lever, its bearings, connections or attachments which made it unsafe to operate? It may be conceded that it did operate unsafely but why did it do so? Likewise, *a boiler operates unsafely when it blows up,* but more than that must be shown to make a case of violation of the act. But a plaintiff cannot recover when his evidence not only shows no defect but also fails to show that the unsafe operation of the appliance was not the result of his own improper act, when the circumstances tend to show that such unsafe operation of the appliance would be a natural and usual result of his improper operation. We do not mean to hold that the evidence must show a broken or worn part to show a defect; such a defect as would cause an improper condition of an appliance and a condition unsafe to

operate, which would violate the act, could be proven by showing that it or some of its parts were loose or not properly adjusted. No one testified that there was ever any kind of defect found in the lever or any of its parts or that it was not in perfect mechanical condition. Is testimony that something not shown to exist could have caused the lever to jump, any evidence that such a thing did cause it? Suppose plaintiff's expert had testified that if a locomotive had five drive wheels on one side and only four on the other side, that would cause the lever to jump. If plaintiff did not have any evidence to show that the engine had more wheels on one side than on the other, could we say that his testimony, that five wheels on one side could cause it was any evidence that there was such an unequal number of wheels and that such a condition did cause it? The testimony of this expert was questionable, since it absolutely ignored the counterbalance spring, which defendant's witnesses claimed would overcome any effect of wear in bearings, but conceding that the jury could believe his explanation of what could result from such a condition, there is still lacking any evidence that it existed. On the other hand, plaintiff's own evidence shows that the unusual action of the reverse lever could have been caused by valve sticking due to a temporary lack of sufficient lubrication. Defendant's evidence was that nothing else could have caused it and that such lack of lubrication could here only have resulted from improper operation. There is no claim that the automatic oiling system was in any respect defective. The evidence showed that it was the engineer's duty to lubricate the bearings and other parts of the gear connecting the reverse lever and the valve from the outside with his oil can; that the oil pipes through which the oil passed to lubricate the valve itself was before his eyes where he could see whether or not it was properly working; that he could regulate the flow of oil through it; and that it was part of his duty to watch it, see that it was operated properly and keep it operating properly. This situation is somewhat similar to that in O'Dea v. Byram (Minn.), 222 N. W. 519, where the latch upon the appliance for shaking and turning the grates of the locomotive became bound (probably by coal and dirt in it) and would not go back into its normal position. While the fireman was shaking the grates with a handle bar the latch fell or flopped over against the grate stub, upon which he had fitted the handle bar to move the grates. This suddenly stopped the movement of his handle bar, jerked him forward and injured him. He brought suit under the Boiler Inspection Act, but the court held that no defect in the latch, and therefore no violation of the act, was shown, saying:

"The appliance was for the use of the fireman, and he controlled and operated it. Any particles of coal or dirt dropped thereon would apparently come from his work in firing. If the latch bound and was tapped back as far as it would go, it would apparently be-

come wedged and less likely to flop than if loose and laid back to where it normally rested.

"The law in question requires that appliances used be safe to operate without unnecessary peril to life or limb. The carrier does not insure safety and cannot reasonably guard against every particle of coal or dirt that may come into an appliance by the work of the operator.

"The evidence fails to show any defect in the appliance, or any condition thereof rendering it unsafe to operate, within the terms of the federal law; hence the injury to plaintiff cannot be found to have been proximately caused or contributed to by any violation of that law."

Other cases holding in various situations that the plaintiff failed to produce sufficient evidence of any defect to show a condition which would violate the Boiler Inspection Act are: Ford v. McAdoo (N. Y.), 131 N. E. 874, certiorari denied Ford v. Davis, 257 U. S. 641, 42 Sup. Ct. 52, 66 L. Ed. 411; Tatom v. Seaboard Air Line Ry. (Fla.), 113 So. 671; Watson v. G. S. & F. Ry. Co. (Ga.), 136 S. E. 921; Luce v. N. Y. C. & St. L. Railroad Co., 205 N. Y. Supp. 273, affirmed, 147 N. E. 212; Auschwitz v. Wabash Ry. Co. (Ill.), 178 N. E. 403; Mahutga v. M., St. P. & S. S. M. Ry. Co. (Minn.), 234 N. W. 474; Fredericks v. Erie Railroad Co., 36 Fed. (2d) 716; Ford v. N. Y., N. H. & H. Railroad Co., 54 Fed. (2d) 342; Lynch v. Delaware, L. & W. Railroad Co. (C. C. A.), 58 Fed. (2d) 177. In the latter case, which is the most recent decision of one of the United States Circuit Courts of Appeal and which was a boiler explosion case, the plaintiff's theory was that there was a defective condition of an injector which forces water from the tank into the boiler. The court said:

"The only issue necessary for our decision is whether there was enough evidence to submit to the jury. *The boiler of the locomotive exploded because the water got too low,* and the water fell because the only injector in operation at the time did not feed enough water into it. *If this was proved to be due to a defect in the injector, the judgment was right,* barring putative errors in the charge, which we pass; *otherwise, it was not.*" (Our italics.)

The court then reviewed the evidence and found that there was none to show any defect in the injector and that the lack of water could have been due to the engineer's failure to open the regulating valve enough. It was argued that although no specific defect was pointed out, it was shown that steam came from the injector. The court concluded:

"To supply this the plaintiff tried to show that the evidence of escaping steam itself showed a defect; but to do so she was obliged to pervert the testimony of the defendant's witnesses. Several of these said that the escape of steam would be very unusual; and of

course it would, if it were steam alone. That is what they plainly meant. All the eyewitnesses saw water as well as steam; and obviously Lynch was not concerned by what he found, for he closed the overflow valve and assumed that his boiler was being fed. Nor is there any substance in the distinction attempted to be drawn between 'steam' and 'vapor.' Harle described it as steam, and saw nothing unusual in it; so did McDonald, one of the men whom Lynch passed. Scott, an expert for the plaintiff, spoke of 'steam' as a normal phenomenon when the overflow valve is open. Those of the defendant's witnesses who were more guarded in their choice of words preferred to call it 'vapor,' though they usually added that it looked like steam. The fancied distinction has no reality, is no more than a straw to save a case which was too speculative. Recent decisions of the Supreme Court (Southern Ry. v. Walters, 284 U. S. 190, 52 Sup. Ct. 58, 76 L. Ed. 239; Atchison, T. & S. F. Ry. v. Saxon, 284 U. S. 458, 52 Sup. Ct. 229, 76 L. Ed. 397), admonish us that we are not in such cases to allow recoveries upon flimsy conjecture beyond the range of solid inference. The evidence is at best no more than evenly balanced, and the plaintiff therefore failed to make out a case. [New York Central R. R. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 562; Burnett v. Pennsylvania R. R., 33 Fed. (2d) 579 (C. C. A. 6).]''

In the present case plaintiff pleaded as the only specific violation of the act a failure to provide an air reverse. At the trial plaintiff abandoned that charge and tried the case wholly upon the theory (not pleaded) that there were worn bearings which created a condition which violated the act. Plaintiff entirely failed to prove that any such condition existed and now asks us to affirm the judgment upon the theory that the jumping of the lever was due to some improper condition thereof which would constitute a violation of the act, although plaintiff does not suggest what such condition could be except that (worn bearings) which plaintiff failed to produce any evidence to prove, and although the only other possible cause of the action which was suggested by plaintiff's evidence was the failure of the engineer himself to keep enough oil running to the valves. In this situation certainly all we can say for plaintiff's evidence is that it only shows that such an unusual action of the reverse lever might have been caused by worn bearings, if any worn bearings had existed, which was not shown, or might have been caused by a temporary failure to keep up proper lubrication, which it was the engineer's duty to attend to, and which failure could only have resulted from an improper operation of the engine. This does not show a violation of the Act. As said by the Supreme Court of the United States, in New York Central Railroad Co. v. Ambrose, 50 Sup. Ct. 198, 1. c. 199:

''It follows that the verdict rests only upon speculation and con-

jecture, and cannot be allowed to stand. [Chicago, M. & St. P. Ry. v. Coogan, 271 U. S. 472, 478; 46 S. Ct. 564; 70 L. Ed. 1041, and cases cited.]

"The utmost that can be said is that the accident may have resulted from any one of several causes, for some of which the company was responsible, and for some of which it was not. This is not enough." [See, also, Lynch v. Delaware, L. & W. Railroad (C. C. A.), 58 Fed. (2d) 177; Pennsylvania Railroad Co. v. Chamberlain (U. S.), 53 Sup. Ct. 391, 77 L. Ed. 503.]

Under the authorities herein cited, plaintiff had the burden of proof to show that defendant had violated the Boiler Inspection Act, but failed to show any condition which was a violation of this act. Therefore, defendant's demurrer to the evidence should have been sustained.

The judgment is reversed. *Ferguson, C.,* concurs; *Sturgis, C.,* dissents.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.