JOHN F. COLE v. UHLMANN GRAIN COMPANY, Appellant.—100 S. W. (2d) 311.

Division One, January 5, 1937.

278

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, Winston H. Woodson* and *Horace F. Blackwell, Jr.,* for appellant.

*Clif Langsdale* and *Roy W. Rucker* for respondent.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff obtained a verdict for $35,000. From the judgment entered thereon defendant has appealed.

While working near defendant's grain elevator in North Kansas City, plaintiff was struck by a steel window frame, blown out by a grain explosion therein. His petition alleged general negligence, but plaintiff's evidence tended to show specific negligence in allowing an unusual and dangerous accumulation of dust to remain in the elevator, and in permitting a condition, in one section of the elevator, whereby a bucket continued to strike against the metal casing in which it moved so as to make sparks which would ignite grain dust and cause it to explode. The case was submitted on that theory.

The explosion occurred in the part of one building of the elevator known as leg No. 4. Defendant's description of the elevator and methods used (conceded to be correct), is as follows:

An elevator leg is the part of the elevator which elevates the grain. There were three elevator legs in this building—No. 4, No. 5 and No. 6, exactly alike except as to capacity. The grain is elevated by metal buckets, attached to an endless belt by flat headed bolts. This belt revolves on two pulleys, one located in the basement and the other the power pulley, located in the top of the building. The power pulley is operated by a separate motor (one for each leg) which motor is located at the top of the leg. This belt, together with the pulleys, is fully enclosed in a metal casing except where it runs through the bin floor, where it is enclosed by concrete. The two vertical parts of this belt are enclosed in separate shafts, the shaft in which the buckets move up being called the upside of the leg and the shaft in which the buckets move down being called the downside of the leg. The part of the leg in the basement, where this belt passed around the bottom pulley, is called the boot. The leg was 212 feet high, thereby making this belt a little over twice that long. Cars of grain coming into the elevator were unloaded into a car dump through a screen, such as used by all elevators, the meshes being about 1½ inches wide and about five or six inches long. After passing through this screen, grain passed through a chute onto wide unenclosed conveyor belts, which carried the grain over to each of the three legs where it was thrown off the belt into a chute leading into the bottom of the leg. The top of this chute, the chute being about two feet deep, entered the leg about six feet above the bottom. Wheat flows into this leg through this chute at the rate of about 10,000 bushels an hour. There were about 820 buckets on the belt in leg four. The belt revolved on the pulleys at the rate of 600 or 700 feet per minute. The buckets struck this current of wheat flowing into the leg and then passed on down through the bottom of the leg, through the wheat there, and becoming completely filled moved on up the upside of the leg to the top, where the grain was thrown

out of the buckets over into the garner. The grain was discharged by these buckets into the garner at the top of the leg. on the downside. From the garner the wheat passed through a chute into the scale hopper, where it was weighed, then it passed through a chute down to the distributing floor, where it passed through other chutes into the different bins.

The elevator was equipped with two separate modern dust removal systems, one, called the Sweep System, to combat the dust outside of the elevator legs, and the other, called the Bud Zink Patent, to combat the dust inside. The Sweep System consisted of a number of suction pipes with openings or mouths therein on the various floors, and was operated by its own individual electric fan located in the upper part of the building on the distributing floor. In order for this Sweep System to operate, this fan on the distributing floor had to be turned on and the dust had to settle on the floor and be swept over to one of the openings or mouths, from which the dust would be sucked up to a cyclone on top of the building. In other words, this system did not suck the dust out of the air. No such suction system was manufactured and this Sweep System used by defendant was a modern and up-to-date system. The other separate dust removal system—the Bud Zink Patent, which combated the dust in the elevator legs, was a separate suction system consisting of a separate suction fan at the top of each elevator leg, operating on the same shaft and by the same separate motor operating each leg. This system would not draw all of the dust out of the air. It would not at all times keep an explosive quantity of dust out of the air in an elevator leg when the leg was operating; and there was no known system which would keep it out.

The floor above the basement was referred to as the work floor or workhouse. The ceiling of this room was the bottom of the bins and there was "about eighty feet of bins between the ceiling of the work floor and the distributing floor" (the floor above the bins). The arrangement of this part of the elevator is shown by the diagram on the following page.

The explosion occurred about eight-twenty A. M. on July 31, 1931. Practically all of the damage was in leg No. 4 of the elevator. Plaintiff was employed by the Burrell Engineering & Construction Company which was engaged in constructing a new building and making alterations in old buildings for defendant. Plaintiff, working in the yard, did not know what hit him. He knew nothing of the conditions in the elevator. Plaintiff did not contend that there was any failure to equip the elevator with proper, efficient dust sweeping and collecting machinery. His counsel admitted this machinery was modern, and properly installed. The claim was that defendant was negligent in failing to properly maintain and operate this machinery. Plaintiff's witness Johann, also employed by the Burrell Company,

UP LEG

DOWN LEG

Concrete Casing.

Concrete Casing.

Concrete Casing.

Bottom Bins

Steel Casing.

Steel Casing.

Steel Casing.

Work Floor

(Plaintiff claims loose bucket struck here)

Steel Casing.

Steel Casing.

Steel Casing.

Spout

Basement

Scale:- 1"=4'

said that he worked in the basement of the elevator about four days before the explosion; that "there was mighty little dust" at first; that "'it began to get dusty''; that "it kept getting worse and worse;" that he "finally had to get a pair of goggles . . . but there was so much dust there that goggles didn't do any good;" that this dust "was in the air and the floor also . . . all over the place . . . looked like it was from three to four inches thick" on the floor; that they would "have to wipe the dust off to find the bolts and the wrenches . . . especially the small ones . . . could not find them on account of the dust;" that the visibility in the basement became very poor on account of the dust; and that he never saw anyone sweeping up or cleaning up dust after the first day. Johann also testified that he heard a noise *in the inclined (down) part of leg No.* 4 on the day before the explosion. He said: "I heard some kind of a knocking between the floor and the basement. . . . It sounded like there was something loose inside . . . like metal hitting metal." He said that he heard the same noise when he went to work on the morning of the explosion. Johann testified further, as follows: "Just a few minutes before four-thirty, quitting time, we crawled through a hole. There was a hole there right above our work. We got up there and kind of cleaned the dust off of ourselves and I noticed a noise in that leg. That is the first time I noticed that noise, that knocking. . . . I observed an opening on No. 4. (Two or three days before the explosion.) . . . It was a square opening. . . . Every once in a while there would be a cloud of dust come out that hole."

Another witness, Cantwell, also employed by the Burrell Company, said that the dust collecting machinery was not working on the morning of the explosion, and testified as to the dust, as follows:

"It was just thick in there, laying there over everything. You couldn't even see the numbers or markings or anything on the parts of material you would have to pick up to use. If you would leave a wrench or anything on the ground it would soon cover up . . . The wheat was covered; couldn't tell whether it was wheat or dust unless you would pick it up and feel it and shake it around. . . . There was a spout out on the east side and I think either an opening or a spout out of the west side. . . . There was lots of dust fogging up, coming out throught there. . . . It was pretty dusty the day before the explosion. . . . They had been having trouble with the motor that run that dust collecting system, of it getting hot, and I think it had been shut down. They had only run it at little intervals."

Another witness, Nipp, testified that he was called to the elevator on the morning of the explosion to do some work on a fan that controlled part of the dust collection system; that this fan was not running that morning; that he looked at it and found "the bearings was

burned out." He also said: "It was very dirty, very dirty; dust on the walls, dust on the pipes; dust practically all over the basement. . . . There was dust in the air." The explosion occurred while he was going to the new building for his tools. Another witness, Myers, also employed by the Burrell Company, said that on the morning of the explosion he heard a noise in leg No. 4 and that "it sounded like something hitting in that belt that carries the grain up. . . . It was a kind of a clicking noise like metal hitting metal as it was going around." Another Burrell Company employee, Marrs, said that during the two days before the explosion "the basement and walls . . . very badly covered with dust and the air was full of dust;" that "you had an enormous amount of dust and the lights at the time looked like little meshes and something in the dust;" and that he had never seen any elevator that was as dusty as this one.

Another Burrell Company man, Rodes, said that "there was a continual noise in Leg No. 4 as though there were loose buckets on the belt and they were striking as they came around the boot pulley." He also said that on the distributing floor "everything was covered with dust. We had to sweep the dust off of this old machinery when we took it down, and we went out for air several times a day." He said that he heard three explosions. "They were real rapid, one right after another, just far enough apart to tell there was three explosions. . . . The first one was that rumble; more of a rumbling sound as though a reverberation; and then at the second one as I looked up to the head house, the old head house, to see where the second one was or what it was, the third one followed instantly and glass began to fly." He also said: "I called attention to the sweeper that the fan hadn't been running. This was a fan that takes the dust from the sweeper system and off the end of the conveyor belt and discharged it out in a cyclone outside of the building. . . . The superintendent . . . ordered me to make inspection of that fan under conditions that they was contemplating changes made in that fan. They wanted to know the condition of the cyclone and the house and the fan so as repairs could be ordered for it. . . . The armature and bearing shaft was both black, showing heat; showing it had went through a heated condition; and the bearings were old type Babbitt bearings and they were worn. . . . So that they would not sustain oil any more. . . . There was a hole in the casing. It broke the vacuum. I would say it wasn't over sixty per cent efficient."

Rodes further testified, as to explosion causes, as follows: "The dust was there. It takes more of a matter of dust than a spark; while a spark has to be, but if there is a less amount of dust and good housekeeping, you won't have a severe explosion like that one. . . . Real fine particles of wheat dust hang in the air and more or less clouds or stratas and as you walk through a wheat elevator when it

is running you can notice different layers of it and when it becomes so dense, one small spark will set the entire dust off just like powder and when it explodes, it doesn't explode very strongly, but with a puff which shakes from the wall particles of dust that are clinging there and forms a thicker cloud from which we have our heaviest explosion.''

Another witness, Weidenmann, who had the contract for the dust collecting system in the new building constructed by the Burrell Company, said he inspected the floor sweeps and valves in the basement where the explosion occurred ''and found several lines in the basement entirely stopped up with dust. . . . Pipes were entirely clogged with dust at that time.''

Defendant's superintendent's testimony at other trials, offered by plaintiff, was in part as follows:

''Q. If dust accumulated in the basement in sufficient quantity to burn, in your judgment, where did it come from? A. It largely came from the openings in the leg that the construction company was working on. . . . Q. Did you know that grain dust would explode? A. Yes, sir. . . . Q. Did you or not know whether it was of a highly explosive nature or low explosive nature? A. From the results I have seen of different elevators it is high explosive. . . . Q. Did you say something awhile ago about if a bucket got loose it might cause sparks? A. That is what I said. . . . Q. Did you or not know that sparks would cause explosions of dust? A. That we do not know; it is assumed explosions commence from ignition from a spark or a flash or a flame of fire. Q. Then you wouldn't know, if I understand you, whether it was safe or unsafe to operate the machinery in this leg as it was operated if there was rather a large accumulation of dust? A. We have never deferred any construction or operation of the elevator on account of dust, we went right ahead with our work.''

Plaintiff had expert testimony, as follows:

''Q. Now, assuming that there is an explosion of grain dust in a metal leg, but that the elevator has been kept clean so that there is no large accumulation of dust on the walls or the floor or the ceilings of the rooms comprising the elevator, is that explosion in the leg likely to do much damage? A. No, not likely to do as much. Q. What is the explosion ordinarily in an elevator that does the big damage? A. The second or third explosion which is caused by the accumulation of dust which is in suspension around the elevator. · . . . Q. Now, what is it that causes explosions of grain dust? A. In order to have an explosion of grain dust you must have dust suspended in air in a proper mixture and you must have at the same time either a spark or a flame of sufficient intensity to ignite that dust. . . . If a bucket is hanging loose enough in the leg to strike the leg casing at any point where it is traveling up at several hundred feet a minute,

and that is the way they travel, it could easily be the cause of a spark in the leg that could ignite dust. . . . It is customary practice to keep the boot and leg casings dust tight.''

The following testimony as to danger from loose buckets came from one of defendant's experts:

''Q. Mr. Basler, what is your opinion, in regard to the danger of a bucket hitting the side of an elevator leg? A. Well, it is a daily occurrence and *the percentage of explosions in proportion to the numbers of knocks is very small.* . . . Q. I believe you testified that in your opinion knocking of buckets in elevator legs, such as this leg at the Wabash, was not dangerous? A. I would say it is not a desirable condition although it happens daily and *of course I wouldn't want to continue that without attention.* It is usually given attention. . . . Q. So that a loose bucket dragging against the sides of the casing would create friction and a spark, wouldn't it? A. It might and it might not. It might run for days on that leg until it wore a rivet off, without doing any damage.''

Defendant had evidence tending to show that the dust sweeping and collecting machinery was properly operating on the day of the explosion and prior thereto; that the elevator was as clean as an elevator could be; that it was not possible to operate an elevator so as to keep it absolutely free from dust; that no machinery will take dust out of the air; that any opening in leg No. 4 was made by the Burrell men; and that there was only one explosion in this case. Defendant's evidence showed (as did plaintiff's) that the explosion was above the basement; that there was considerable damage on the work floor (the conflict was concerning damage on upper floors); that ''the most damage was done to the casing'' and was below the bins and above the basement ceiling; that ''the main force of that explosion was in that No. 4 leg between the floor and the ceiling of the workhouse;'' and that there the casing of the down leg ''was blown out from the ceiling down to the floor.'' Defendant's evidence further showed that there was no way to keep foreign substances, known as ''tramp metal'' from coming into an elevator in the wheat; that ''shotgun shells, rifle shells, steel harrow tooth, chisels, hammers, . . . concrete, glass, all kinds of foreign material, iron, nails'' were found in the grain; that the grain was dumped through a grate or screen, with openings to catch ''tramp metal'' (plaintiff admitted that the grate used was properly constructed); that smaller screen openings than those used would get clogged and were not practical; that such ''tramp metal'' might, if struck by a bucket, ''cause a spark and cause an explosion;'' that such ''tramp metal'' might be carried up and dropped out of a bucket; but that there was a screen at the top to prevent it from falling into the down leg when the bucket dumped into the garner. It was also shown that the heads of bolts which held the buckets on the belt might become bent so as to make sparks as they went over the

pulleys, and that lighting a match could cause an explosion. A further statement with reference to defendant's testimony hereinafter appears in connection with the contentions made concerning the examination of its expert witnesses.

Defendant's first contention is that the court erred in refusing its requested peremptory instruction. Defendant says that there are two questions on demurrer, as follows:

"First, was defendant negligent in causing or allowing this explosive mixture of dust and air in leg four? and, second, was defendant guilty of any negligence which caused the spark or flame which ignited this explosive mixture of air and dust?" .

Defendant argues that even "with the most modern machinery, the air in an elevator leg is likely at any time to be laden with an explosive mixture of dust;" and that "therefore, the essential and only question to determine with respect to both negligence and causation is whether or not a bucket in this leg caused a spark which caused the explosion." Defendant contends that plaintiff's evidence was not sufficient to make a jury case on that issue. Because of the view we take as to this and other contentions, we will consider this matter only upon the specific negligence case submitted.

Defendant's argument overlooks plaintiff's evidence that an unusual and negligent accumulation of dust caused a series of explosions, which were severe enough to injure plaintiff working outside the elevator. There was a grain dust explosion. Therefore, there was an explosive accumulation of dust in and around leg No. 4, and there was a spark created which ignited it. However, an explosion within the leg itself only might not have injured plaintiff. The real questions are whether plaintiff's evidence was "sufficient to warrant a finding that there was an unusual accumulation (all over the building) sufficient to cause the severe explosion or explosions, which did injure him; and whether this and the spark to ignite it were both due to defendant's negligence? In considering this matter, we recognize the rule that, where the evidence shows that the occurrence which caused plaintiff's injury may have resulted from two or more causes, in order to hold defendant liable, plaintiff must have substantial evidence tending to show that the cause for which defendant would be liable was the actual cause thereof. [Fryer v. St. L.-S. F. Railroad Co., 333 Mo. 740, 63 S. W. (2d) 47; Strother v. C., B. & Q. Railroad Co. (Mo.), 188 S. W. 1102; Beebe v. St. Louis Transit Co., 206 Mo. 419, 103 S. W. 1019; Fuchs v. St. Louis, 167 Mo. 620, 67 S. W. 610; New York C. Railroad Co. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 562; Penn. Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819.] "Whether the evidence in a given case is sufficient to support the finding of the jury, when taken and considered in the fashion in which it must be on demurrer, depends on whether it is sufficient to establish with reasonable certain-

ty in the minds of persons of ordinary and average intelligence the existence of the facts on which the finding is necessarily based." [James v. Bailey Reynolds Chandelier Co., 325 Mo. 1054, 30 S. W. (2d) 118, l. c. 123; see, also, McDonald v. Kansas City Gas Co., 332 Mo. 356, 59 S. W. (2d) 37.] The situation in these two gas explosion cases, as to whether a jury case was made, is strikingly similar to this case. In both there was shown to be an explosive accumulation and a condition which would create sparks to ignite it. For the plaintiff to recover, it was necessary for the jury to find that this situation was due to defendant's negligence. Plaintiff here did not dispute the fact that defendant had modern and efficient machinery for removal of dust. What plaintiff claimed and had evidence tending to prove was that a dangerous amount of dust accumulated because this machinery was out of order, was not properly operating, and had not been so operating for several days prior to the explosion; that defendant's failure to promptly repair and operate this machinery or to otherwise prevent such dust accumulation was the negligence which created the unusually dangerous accumulation; and that except for this unusual accumulation all over the building an explosion due to dust and sparks in any leg would have been confined to that leg.

We hold that plaintiff's testimony above stated was substantial evidence to so show. The fact that all dust could not be kept out was no excuse for allowing much dust, that could reasonably be removed, to accumulate. When plaintiff showed that defendant was guilty of acts or omissions, which might reasonably be found to have been the cause of this accumulation of grain dust in such dangerous and explosive quantities, then if plaintiff further showed other facts from which it might be reasonably inferred that there was also an unusual condition existing which would create sparks (a steel bucket frequently striking the steel casing with great force), of which defendant knew or by the exercise of reasonable care could have known, there can be no question that there was a case made for the jury to find a negligent cause for the explosion. "Such inference does not follow as a necessary conclusion from the facts and circumstances hypothesized, and of which there was substantial proof, but it is a fair and reasonable one, and may therefore be legitimately drawn by the trier of fact." [James case, supra.] The jury could have decided not to make this inference, if they believed it to be reasonable that "tramp metal," or some other thing, caused the spark, that set off the explosion. It also certainly was within the jury's province to make the other inference and put the two things together —the finding that an unusual dangerous explosive accumulation was caused by defendant's negligence, and that a condition existed, of which defendant knew or by due care could have known, which would make sparks. Such an explosive accumulation and frequent sparks

would, if it continued, almost inevitably mean an explosion. Therefore, if the jury found that defendant's negligence caused such accumulation as could make a severe explosion or explosions, it was only necessary to further find that sparks were created by a condition which defendant could reasonably have known would create sparks. The jury had the description of the noise in the leg. Surely they might believe that "tramp metal" would not have made a continuous noise like a loose bucket. They could properly consider the fact that the explosion blew out the leg casing at and above the place where the leg turned from a direct downward course to an incline. If it was a reasonable inference from the facts in evidence that a loose bucket was striking the casing there (and we hold that it was), that shows the condition which would create sparks. The experts said that such a condition would make sufficient sparks, and it hardly requires expert testimony to prove that steel striking steel with the force, necessarily shown by the speed of the belt in this case, would create some sparks. We hold that the demurrer was correctly ruled.

■ Defendant also assigns errors relating to the examination of witnesses and the admission and exclusion of evidence. Defendant contends that the court unduly limited its cross-examination of plaintiff's witness Johann. He testified that he worked in the basement four days before the explosion; that men were sweeping dust the first day but that he did not see anyone sweeping dust after the first day. Defendant read from Johann's deposition, in which he had stated that during the four days he was working he had seen elevator employees there and that "some were shoveling wheat and others sweeping around and doing things of course that I didn't pay any attention to." Defendant's counsel, after reading this answer, asked Johann the following question:

"Q. Now, you say in your deposition that others were working there and sweeping during those four days and now you say that for two or three days before the explosion you did not see—for four days before the explosion you did not see anyone sweeping there. Which answer is correct? (This was objected to as argumentative and assuming there is any difference in the answers.) The COURT: Sustained. The jury has both answers." (Exceptions saved by defendant.)

Defendant asked no other question about the matter. It will be noted that the answer in the deposition did not say definitely what days the witness said he saw men sweeping, what days he saw them shoveling wheat, and what days he said he saw them doing other things. We hold that there was no prejudicial error in sustaining the objection to this question.

■ Defendant's counsel also asked Johann about his answer in his deposition as to the noise he heard, in which he said: "I heard a

rumbling noise; a knocking noise in the leg." The question, objection, and ruling was, as follows:

"Q. (By Mr. Woodson) You said here yesterday when you were asked about that noise that it sounded like metal hitting against metal. Which is correct? Mr. LANGSDALE: I object to that, if your Honor please, as argumentative. It is for the jury; and for the further reason there is no discrepancy in the answer given in the Stevens trial and his answers here. The COURT: Objection sustained. Objection sustained for the reason the witness didn't say 'rumbling' It was in the question." (Exception saved by defendant.)

The court was wrong in this statement because the witness did say in his deposition that he heard "a rumbling noise," although the term "rumbling noise" was also used therein by defendant's counsel in one of his questions. The witness, however, in his answers in the deposition, read by defendant's counsel before he asked the question at the trial to which the objection was sustained, described the noise as "a rumbling noise," "a knocking noise," and a noise that "sounded like it was hitting something down in the bottom of the leg," and also said that it "kept pounding" on the morning of the explosion. Since the witness therefore had not limited his description merely to a rumbling it could hardly be fairly charged against him that there was a direct conflict in this statement at the trial that it sounded like "metal hitting against metal" and the statements made in his deposition. The jury had all of these statements before them, and we hold that, under these circumstances, the court's action in sustaining the objection, even on an incorrect ground, could not have been prejudicially erroneous.

■ Defendant further contends that the court should have discharged the jury, as it requested, because of an improper and prejudicial statement made by plaintiff's counsel in a question asked defendant's superintendent during cross-examination. The superintendent's testimony tended to show that there was no explosion in the scale room where an employee, Charles S. Stevens, was working at the time. The questions, objections, and rulings of this court, were as follows:

"Q. And he is the one that sued you over in Platte County, Charles S. Stevens versus Uhlmann Grain Company? A. Yes, sir. Q. He was injured up there? A. Yes, sir. Q. Yes, sir; at the place where you say there was no explosion or damage? A. I don't believe I said there was no explosion any place in the elevator. Q. He was injured to the extent that he got a six-thousand dollar verdict? Mr. Woodson: Just a minute. I object to that if your Honor please. Mr. Righter: And I ask that counsel be reprimanded for making an improper remark like that in the presence of the jury. It is the most inexcusable thing I ever heard in the court room. . . . (Mr. Woodson also moved 'to discharge the jury on account of the

prejudicial question.') The COURT: There have been a lot of speeches made in this case on both sides that ought not to have been made. Now, gentlemen of the jury, the objection to the question is sustained. The motion to discharge the jury is overruled. The court will once again admonish you gentlemen. This court is not in the habit of reprimanding counsel on either side. The court will again admonish you that when you come to deliberate upon your verdict you will wholly ignore any comments or statements made by counsel on either side and confine your attention solely to the evidence as you hear it from the witness stand and to the instructions of the court as to the law.'' (Defendant saved this exception.)

This question was improper. Had the court sanctioned it, by overruling the objection and allowing it to be answered, that would have been reversible error. [Warren v. Pulitzer Pub. Co., 336 Mo. 184, 78 S. W. (2d) 404, 1. c. 419; see, also, Bishop v. Brittain Inv. Co., 229 Mo. 699, 129 S. W. 668; Evans v. Town of Trenton, 112 Mo. 390, 20 S. W. 614; Chowning v. Parker, 104 Mo. App. 674, 78 S. W. 677.] The court, however, sustained the objection and instructed the jury to disregard it. Whether the situation required further or more drastic action was a matter within the discretion of the trial court. We find nothing to indicate that this discretion was not properly exercised or that it was prejudicial error for the court to fail to do more than it did.

 Defendant further contends that the court should have discharged the jury, as it requested, because plaintiff's counsel was permitted to show that the Globe Indemnity Company was interested in the defense of the case as an insurer. Defendant's counsel was questioned, before the *voir dire* (out of the jury's presence), and stated that this company was paying the defense attorneys. Although it does not appear, we may assume that plaintiff's counsel used this information (in a proper way because defendant makes no complaint) in the examination of jurors. Later in the trial, plaintiff's counsel on cross-examination of one of defendant's doctors (who testified to the effect that plaintiff was a malignerer and faker) brought out that the doctor made examinations for insurance companies. The doctor was asked to name these companies and, among several others, named the Globe Indemnity Company. No objection was made to this by defendant, nor to further questions in answer to which he said that when he made examinations for the Globe Indemnity Company, he did that for Mr. Frank Barry; and that he made his reports in such instances to Mr. Frank Barry. No reference was made to any connection of the Globe Indemnity Company with this case.

Defendant does not assign any error as to this doctor's examination, but bases its claim of error upon the following colloquy, which occurred when Mr. Barry was later called as a witness by plaintiff on rebuttal, namely:

"Mr. LANGSDALE: Mr. Barry has been subpoenaed and I informed these gentlemen I wanted him to be sure and be here this morning. Mr. WOODSON: Don't look at me. I have no control over Mr. Barry. If you want him down here, get him down here. Mr. LANGSDALE: You are representing Mr. Barry in this matter. Mr. RIGHTER: I object to that, Your Honor, and ask that it be stricken out and the jury instructed to disregard it. There is no provocation or excuse for a statement like that. The COURT: Well, I have admonished the jury so often. (Exception saved by defendant.) . . . Mr. LANGSDALE: . . . He says he has no control of Mr. Barry. Of course, I have the right to reply that he is representing him. The COURT: Do you want an attachment for him? Mr. WOODSON: I move to discharge the jury on account of the prejudicial remark. The COURT: Overruled." (Exception saved by defendant.)

Plaintiff's explanation of the purpose of calling Mr. Barry, whose name appeared on the pleadings as an attorney for defendant and who said defendant's attorneys, actually trying the case, were associated with him in its defense, was as follows:

When the plaintiff was first on the stand he had been interrogated about previous injuries, and had forgotten to mention an injury for which a suit had been filed by his present attorney, Clif Langsdale. In that petition, in 1916, he had claimed a head injury. The case had been settled for $150, and both the plaintiff and his counsel had forgotten about it. At the close of plaintiff's case, defendant's counsel produced the old petition and the release, which made it appear that the plaintiff and plaintiff's counsel, Mr. Langsdale, had deliberately attempted to conceal the 1916 suit from the jury. Plaintiff's counsel, put Mr. Barry on the stand to show that he had signed the answer in the suit in 1916, and had also signed the answer in this suit, believing that would convince the jury that there was no intention to conceal the fact of the first suit, Mr. Barry having been in both cases.

Defendant says that the purpose of calling Mr. Barry as a witness "was to establish indelibly in the minds of the jury the defense of the case by the Globe Indemnity Company." However, the Globe Indemnity Company was not mentioned in calling Mr. Barry as a witness nor during his examination, about the former suit and settlement. We do not think that this can be construed to be a persistent effort to "get the jury to understand that an insurance company will ultimately have to pay the damages assessed" such as this court denounced in Whitman v. Carver, 337 Mo. 1247, 88 S. W. (2d) 885; Rytersky v. O'Brine, 335 Mo. 22, 70 S. W. (2d) 538; and Olian v. Olian, 332 Mo. 689, 59 S. W. (2d) 673, cited by defendant. The situation here was so different from the ones considered in those cases that we hold that it was not error for the court to overrule defendant's request to discharge the jury, which was asked for on the ground that it was prejudicial to state that defendant's counsel at the trial

were representing Mr. Barry, rather than on the ground that it was an attempt to inject insurance into the case.

■ Defendant further complains that the court improperly limited the direct examination of its experts Ahlskog, Basler, Peterson, Wilson, and Manning. Ahlskog's testimony, which is illustrative of defendant's theory as stated by all of its experts, in part, is as follows:

"To get a dust explosion we have to have a certain amount of dust suspended in the air. The dust must be dry and of certain fineness and sufficiently in quantity to form an explosive combination. Dust will not explode under all conditions. Some grain dust will not explode under any conditions; and no grain dust will explode if it is piled in a heap on the floor. It must be suspended in the air to make, it explode. You need a flame or spark to ignite some, of the dust and set the rest afire and explode. That is the general principle. . . . There is no equipment in use today that would so completely remove the dust as to fully eliminate the danger of an explosion. . . . Commercial grain will contain on the average about two per cent of dust. . That means with the grain we are bringing in fifteen thousand pounds of dust every hour. . . . Assuming someone should develop dust collecting equipment with ninety-eight efficiency, that would still allow two per cent or three hundred pounds of that dust to escape; three hundred pounds or twenty bushels of dust suspended in the air, if it happened to be the proper kind of dust and properly mixed, would be sufficient to blow up any elevator. . . . These particles, in traveling around, are finally ground up until they are as fine as the finest flour, and, being lighter than flour, they will remain in suspension for a considerable length of time. . . . Elevator that has been in operation some time will at all times contain enough dust to supply a good sized explosion. . . . Sparks are liable to be created inside of a leg and there is no means to prevent that. . . . Foreign substances enter the leg with almost every carload of grain that is received. . . . If a bucket should happen to strike one of these objects, a spark is almost certain to result. . . . Experiments have shown that we usually have an initial explosion. From this explosion flames and sparks spread out and it is followed by a series of additional explosions. Each successive explosion, of course, causes the air to expand and builds up an increased pressure."

The following questions were then asked Mr. Ahlskog:

"Q. In your opinion, would it have been humanly possible for anyone to have inspected that elevator, that leg of the elevator after the explosion and to have determined with any certainty the cause of that explosion? A. No. The exact cause could not be determined because it has been removed long before the explosion was completed. Q. Will you explain your answer? Please tell us why you couldn't determine what caused it."

Objection was made to this last question unless further facts shown by plaintiff's evidence, as to the noise in the leg and the condition of the belt, were considered with it. Defendant's counsel would not include them and the witness was not allowed to explain further why he thought it was not possible to determine the cause after the explosion. He was, however, permitted to further testify, as follows:

"If a piece of foreign material was struck at the bottom of the leg while grain is rushing in, the spark probably would be immediately extinguished by the onrushing grain. There isn't enough air at that point any way to cause an explosion. The only place where it could be of danger would be if a bucket strikes foreign material above the grain level. That would be at the point where grain enters the leg."

The complaint as to limiting the examination of witnesses Peterson and Wilson were that they were not permitted to answer similar questions as to whether it was "humanly possible for anyone to determine the cause" of the explosion. It is usually true, as the court stated in its rulings, that a "witness can only testify what he knows," what he "knows about," or "what he determined himself," at least unless there is a proper issue as to what is scientifically possible. While plaintiff could not require defendant to include disputed facts, nevertheless, whether it was "humanly possible for anyone" to determine the cause of any elevator explosion, after it had happened, was certainly too broad a question and required some limitation, to confine it to the facts of the case at bar, before the answer could throw any light on the issues before the jury; and it was immaterial here, because plaintiff was not attempting to make a case upon an examination of the elevator after the explosion. Plaintiff did not deny the claim that "tramp metal" could cause an explosion or that it would be blown away if it did cause it. Plaintiff made an admission in the record that "all these things, the other witnesses said, might cause it." Plaintiff's contention, that defendant's negligence caused this explosion, was based upon evidence of conditions existing before the explosion. (Dust collecting machinery not operating and buckets striking the casing). The only things that either party attempted to show by inspections of experts was the extent, severity, and effect of the explosion. If it was not error to sustain an objection to the question, it was not error to refuse to permit an explanation of an answer to it. It will also be noted that Ahlskog had already stated his reason for saying that the cause could not be determined, and afterwards further explained "tramp metal" explosions.

· ■ We will not further lengthen this opinion to set out all the questions asked witnesses Manning and Basler, as to which defendant assigns error because the court sustained objections, since these questions were either subject to this same criticism, went to matters not properly subject to expert testimony, or referred to matters which were testified to by them or by other witnesses at some time during

the trial so that their answers would only have to be cumulative as to facts or opinions in evidence. There was considerable repetition in the course of putting in defendant's expert testimony and there was no dispute between the parties as to many of their statements and opinions. We hold that the court did not abuse its discretion in limiting them in the instances assigned as error. It is, of course, as defendant contends, not a valid objection to proper expert testimony that the question invades the province of the jury or calls for a conclusion of the witness, so long as it is not a conclusion of law. [Young v. Wheelock, 333 Mo. 950, 64 S. W. (2d) 950; Fields v. Luck (Mo.), 44 S. W. (2d) 18.] "It is the province of the jurors to draw all inferences and conclusions from the evidence before them. The witnesses, as a general rule, must state facts from which the jurors are to form their opinion. But when the facts are all stated, upon a subject of inquiry, if an intelligent opinion cannot be drawn therefrom by inexperienced persons, such as constitute the ordinary jury, an exception is made to the general rule, and persons who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion. The exception is allowed from necessity. *An expert witness, in a manner, discharges the functions of a juror*, and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience, or knowledge of the subject, to draw correct conclusions from the facts proved." [Cole v. Empire District Electric Co., 331 Mo. 824, 55 S. W. (2d) 434.] The experts' opinion is properly received when "the fact that a witness possessing the necessary skill would draw a certain inference, from the facts, possesses such probative force as justifies its reception as some evidence that such inference is the correct one." [Young v. Wheelock, supra; see, also, Kimme v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561; Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617; DeDonato v. Wells, 328 Mo. 448, 41 S. W. (2d) 184.] While it probably would not have been prejudicial error against the plaintiff in this case to have permitted defendant's expert witnesses to answer some of the questions ruled out, we are satisfied from an examination of the whole record that defendant was allowed to cover all the material issues properly subject to expert testimony, and that no prejudicial error was committed, in the rulings of which complaint is made.

Defendant also makes complaint that the attitude of the court was prejudicial to defendant and cites, in its brief, a number of remarks and comments of the court during the trial, which it now claims were prejudicial. It would serve no useful purpose to lengthen this necessarily long opinion to set out any of these incidents claimed to show prejudice. Defendant made no such complaint in its motion for new trial, but did assign as grounds therein certain specific rulings

of the court during the examination of witnesses, as well as more general complaints concerning admission of incompetent evidence and exclusion of competent evidence. We have therefore confined our review to such matters as were properly within these stated grounds, since it is not apparent from the whole record that defendant did not have a fair trial. However, we will say that, after a careful examination of the bill of exceptions which covers 850 pages of the printed abstract and shows a trial lasting more than a week, we are convinced that the court was impartial in its attitude; that its remarks and comments were not intended to be prejudicial to defendant; that they cannot reasonably be construed to have had that effect. The case was hard fought and well tried, but not at all times dispassionately tried, by counsel for both parties. While the court at times pressed counsel to complete the examination of witnesses and to avoid repetition, we find nothing obviously improper in its action. Before the case was submitted, the court admonished the jury that on all occasions in the course of the trial, when counsel spoke sharply to each other, they were only representing their clients and that, when the court spoke sharply to counsel, the court was not interested in either side except to see that each side had a fair and impartial trial. The court stated that all such occasions were to be disregarded by the jury in deliberating upon their verdict, and apologized for any irritation shown. The court also made a similar statement early in the trial. Apparently defendant's counsel accepted these statements of the court, at the time, as removing any possible prejudicial effect of any such incidents, since they said nothing about it in their motion for new trial. For this and the other reasons above stated, this matter will not be further considered here.

▇▇▇ Defendant further assigns error in the court's action on instructions. It contends that its accident Instruction G should have been given and that plaintiff's main Instruction No. 3 was erroneous. Defendant's accident instruction was properly refused because it did not give a complete and correct definition of an accident. "In the legal meaning of the term accident an 'essential requirement is that the happening be one to which human fault does not contribute.' " [Wilson v. Chattin, 335 Mo. 375, 72 S. W. (2d) 1001; Hogan v. Kansas City Public Serv. Co., 322 Mo. 1103, 19 S. W. (2d) 707.] The definition in defendant's Instruction G ignored this essential element. Moreover, the court did give defendant's Instruction F directing them to find for defendant if they "were unable to determine the cause of the explosion . . . without resorting to guess work, speculation or conjecture," as well as two burden of proof instructions and an instruction telling them that plaintiff could not recover unless they found that the explosion was caused by a spark or flame which "was the result of some specific negligent act or omission of defendant.

The criticisms made as to plaintiff's Instruction No. 3 are that it submits a charge of negligence not pleaded, and that there was no evidence to support it. This latter contention was ruled by our ruling on defendant's assignment concerning the refusal of its peremptory instruction. The negligence submitted was that "an unusual, dangerous and explosive accumulation of dust" had been "caused and permitted" by defendant, and that "there was in leg No. 4 a bucket which had been striking against the metal casing around said leg" of which "defendant knew or by the exercise of ordinary care could have known . . . (and knew also 'that said bucket so striking said metal casing, if so, might cause and generate a spark which would ignite dust in said leg and cause an explosion') . . . within time to have, by the exercise of ordinary care, stopped the machinery in said leg and remedied the condition." Of course, no instruction based on a *res ipsa loquitur* petition could be broader than the pleadings. The negligence issues here were properly narrowed to the specifications submitted because defendant's proof tended to definitely show this specific negligence which, if the explosion was due to any negligence of defendant, must have been the negligence that did cause it. [Conduitt v. Trenton G. & E. Co., 326 Mo. 133, 31 S. W. (2d) 21; Sanders v. City of Carthage, 330 Mo. 844, 51 S. W. (2d) 529; Powell v. St. J. Ry., L., H. & P. Co., 336 Mo. 1016, 81 S. W. (2d) 957.] Defendant's contention is based on the fact that after pleading generally that the explosion was caused by defendant's negligence, plaintiff's petition further stated that defendant "negligently failed to warn plaintiff that said explosion likely would occur," although it "knew or by the exercise of ordinary care would have known that said explosion was likely to occur." Defendant says that this failure to warn was the only specific negligence pleaded; that it superseded the general charge; and that it was, therefore, the only ground of negligence that could be properly submitted. While failure to warn, under some circumstances, would be a charge of specific negligence (cases of the approach of vehicles or of the occurrence of some event that defendant intended to bring about, for example), we do not think it can be properly construed here as a charge of negligence at all. It did not in any way explain what negligence the general charge was intended to cover. It stated nothing that would even tend to show any negligence of defendant which could have been the cause of the explosion, and it was the result of an explosion, caused by negligence of defendant, that plaintiff sought to recover. It could "only go to show that plaintiff was unaware of the danger." [Cull v. McMillan Contracting Co. (Mo. App.), 178 S. W. 868; Crupe v. Spicuzza (Mo. App.), 86 S. W. (2d) 347.] We hold that it could be properly treated as mere surplusage so far as the charge of general negligence was concerned, and we find that the case was tried by both parties on the theory that the petition

only charged general negligence. Of course, even if he had a proper *res ipsa* case (which we do not decide), plaintiff had the right to show specific negligence if he could, and, when he produced such evidence, he had to submit his case on the theory that his evidence tended to prove. A *res ipsa* instruction would have been erroneous but it was not error to give this instruction. We hold that the jury was correctly instructed.

Defendant also contends that the verdict is excessive. Plaintiff was struck by a steel window frame, that weighed more than 100 pounds, which was blown out of the elevator onto the top of a two-story building, near which plaintiff was working. Plaintiff was forty-five years old at the time of his injury, and was earning $6 per day working five and one-half days per week. This was a weekly average of $33, or $1716 per year. He had, at other times, worked as a plumber and as a construction foreman. He had also earned as much as $12 to $14 per day as a deep well foreman. Considering the evidence from the viewpoint most favorable to plaintiff, it was sufficient to show two serious permanent disabling injuries. A brain injury from concussion and a sacroiliac sprain. It was not shown, however, that he sustained a skull fracture or broken bones. The X-ray "showed nothing abnormal." Plaintiff was first taken to St. Luke's Hospital where he remained about five days. After being at home a day, he was placed under the care of Dr. Neal, who had him taken to St. Joseph's Hospital, where he remained about six weeks.

Plaintiff's head injury was a scalp wound about five inches long and a concussion of the brain sufficient to cause small pinpoint hemorrhages. He suffered from severe headaches, was irritable, could not sleep well and lost weight. Dr. Neal said this injury caused mental dullness, frequent headaches, and a disturbance of hearing. Dr. Neal said that he determined by drawing fluid from the spinal canal that plaintiff had an intracranial pressure much greater than normal. Dr. Neal's description of his condition was that "it is best described by the word—by the term 'mental deterioration.' " He said: "He shows some disturbance of his ability to describe things. His memory is very faulty; and he has not the alertness to grasp questions. . . . It will not improve and, in my opinion, will grow worse because it has shown a progressive deterioration since September, 1931. . . . My explanation of that is that he got over his immediate shock to his brain and it resumed its normal function apparently and then later, after the diffused injuries became more permanent, contraction of the scar tissue, the organic changes in the brain produced his return of incoherency and the other symptoms. . . . This loss of memory and loss of consciousness for the time being would be an indication of epilepsy. . . . I have not sufficient facts before me to make a diagnosis of epilepsy. I can say that it might be a suspicion of epilepsy."

Dr. Neal said that bleeding from the ears (there was evidence that plaintiff did have blood in his ears after the injury) was evidence of a basal skull fracture which might not be disclosed by X-ray. Dr. Neal and other doctors said that plaintiff's mental condition was hysteria, similar to shell shock. Dr. Elliott, who also treated plaintiff, said: "I came to the conclusion that this man had a mental condition caused by a head injury which produced, I believe, diffuse damage to the brain; and he has some manifestations that are rather suggestive of epilepsy. It may be epilepsy." Dr. Stowers, who examined plaintiff before the trial, said: "As a result of my own examination I arrived at an opinion that this man was suffering from a rather severe concussion of the brain which had become chronic. . . . I arrived at a diagnosis of a phychoneurosis. . . . It is a condition in which there is no disease present but it is a state of the mind which affects the whole nervous system, usually brought on by some emotional disturbance, very frequently injury. . . . A disturbance of the sensation, weakness, likewise irritability, increased emotional nervousness, all of which are indicative of such a condition. . . . It is a condition quite similar to shell shock." ·

Plaintiff's sacroiliac injury required him to wear a supporting belt and to walk with a cane. Dr. Neal said: "He has the usual evidences of a lumbo-sacral sprain, which are limitation of motion in the small of the back, the lumbar vertebrae held stiffly and moving as one piece; the muscle spasm that accompanies it; tenderness over the muscles, particularly on the left side, the small of the back." Dr. Elliott said: "He limps a great deal with the left leg; has tenderness over the left sciatic nerve; and a damaged left ankle jerk, which I think means injury to the back and left sacroiliac joint." Dr. Mercer said that plaintiff's condition could be improved by "transplanation of bone; take a piece of bone out of his leg and place it in his back in an effort to lock those two joints," and that if this was successful "he would certainly have fifty per cent (efficiency) for hard labor." Dr. Stowers said plaintiff's back injury was: "A sacroiliac strain on the left side and a lumbo-sacral strain which involves both sides. . . . The man is perfectly unable at the present time and in my opinion will not be able in the future to carry on a gainful occupation of any sort, not even sitting, unless he would have an operation for the stabilization of his spine, which in turn mostly probably would leave him with a fifty per cent permanent total disability. . . . I would classify him in the class of back injuries which, where they are incapacitated, unable to work, unable to keep comfortable."

We must consider that the jury believed the testimony most favorable to plaintiff and found that he was permanently disabled by his injuries. Nevertheless, considering other precedents, as well as plaintiff's age and earning capacity we must hold that the verdict was excessive. The present value of plaintiff's earnings ($33 per week at

the time of his injury) according to our statutory tables on the basis of an annuity of six per cent would be $19,610.45. While the monetary value reached upon the basis of a continuation of the wages then earned by a person, who is totally disabled as a result of injuries, cannot be the sole guide for arriving at the amount of his damages, nevertheless the verdict must be considered unreasonable if it is too far above that amount. [Midway National Bank & Trust Co. v. Davis, 288 Mo. 563, 233 S. W. 406; Pulliam v. Wheelock, 319 Mo. 139, 3 S. W. (2d) 374; Frese v. Wells (Mo.), 40 S. W. (2d) 652; Truesdale v. Wheelock, 335 Mo. 924, 74 S. W. (2d) 585.] Considering the fact that plaintiff did show a capacity to earn higher wages than he was receiving when injured, and considering also the pain and suffering which the jury might believe resulted from his injuries and his mental condition, we hold that a verdict could be reasonably permitted to stand in this case for a greater amount than the annuity value of the wages he was receiving. Our conclusion is that a verdict greater than $25,000 would not be warranted by the evidence. [See Brock v. C., R. I. & P. Railroad Co., 305 Mo. 502, 266 S. W. 691; Unterlachner v. Wells, 317 Mo. 181, 296 S. W. 755; Kepner v. C., C., C. & St. L. Railroad Co., 322 Mo. 299, 15 S. W. (2d) 825; Ramey v. Missouri Pacific Railroad Co., 323 Mo. 662, 21 S. W. (2d) 873; Keyes v. C., B. & Q. Railroad Co., 326 Mo. 236, 31 S. W. (2d) 50; Savage v. C., R. I. & P. Railroad, 328 Mo. 44, 40 S. W. (2d) 628; Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. (2d) 903; Kelso v. Ross Const. Co., 337 Mo. 202, 85 S. W. (2d) 527; Colwell v. St. L.-S. F. Railroad Co., 335 Mo. 494, 73 S. W. (2d) 222; see also Pandjiris v. Oliver Cadillac Company, 339 Mo. 711, 98 S. W. (2d) 969.]

If plaintiff will enter a *remittitur* for $10,000 as of the date of the judgment, within ten days, the judgment will be affirmed; otherwise, the judgment will be reversed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.