ALLACE SNOWWHITE v. METROPOLITAN LIFE INSURANCE COMPANY, a Corporation, and MARTIN NUSHY, Appellants.—127 S. W. (2d) 718.

Division One, May 2, 1939.

706

*Louis R. Weiss* for Martin Nushy; *Mosman, Rogers, Bell & Buzard* for Metropolitan Life Insurance Company.

C. S. *Walden, Frank D. Rader, Paul S. Conwell* and *Leo A. Spalding* for respondent.

BRADLEY, C.—Action to recover for personal injury, in an a-mount within the jurisdiction of this court. Verdict went for defendants. A new trial was granted and defendants appealed. We might state that plaintiff, respondent here, has not favored us with a brief.

Defendant, Nushy, owned and was driving the car that struck plaintiff. He, at the time, represented defendant, insurance company, and had assigned to him a certain area or territory, in Kansas City, Mo., called an industrial debit. It was his duty to call weekly upon those holding industrial policies in his debit and collect premiums thereon. Also, he took applications for industrial policies and for ordinary life insurance policies. For collecting premiums on his debit policies he received 15 per cent of amount collected, and when ordinary life insurance policies were issued on applications he secured, he received a commission on the premiums paid like the ordinary life insurance agent. The defendant, insurance company, knew that Nushy had a car, and he had the company's consent to use the car in working his debit, but the company had nothing to do with the car's upkeep, and paid nothing on its operation. Also, it appears that the defendant, insurance company, had no control over Nushy as to the manner in which he worked his debit, or when he worked it, except it was his duty to work it weekly.

Plaintiff proceeded on the theory that, at the time of her injury, Nushy was on a mission for the insurance company, and that the facts were such that both Nushy and the insurance company were liable.

The case went to the jury solely on the humanitarian doctrine. A new trial was granted on the theory that error was committed in giving Instruction L (hereinafter set out) on behalf of defendants. Defendants contend that Instruction L was proper, but if not, they say that the matter is of no consequence because plaintiff failed to make a submissible case, and that the court should have given their separate demurrers to the evidence at the close of the whole case.

Defendants have filed a joint brief, but most of it is taken up with the contention that plaintiff failed to make a submissible case against

the defendant, insurance company, and we first dispose of that contention.

Plaintiff was struck and injured on December 22, 1932, about 6 P. M., and the case was tried for the second time on March 2, 1936. According to the defendant, Nushy, on the day of plaintiff's injury, he resided in north Kansas City, and quit work in his debit about 4 P. M. After quitting work, he went home, changed clothes, and had supper. He then went from his home to a beauty shop in Kansas City to see Miss Vera Melching about getting a package, which he says was a cake. He says that he was intending to take this cake to Miss Opal Denton at 3641 Central Street, and with whom he had been "going out," and who had asked him to pick up the package "and bring it out there some time that day." Nushy testified that, when his car struck plaintiff, he was on his way to deliver the cake, and was not on any mission for the defendant, insurance company. Nushy's debit was a certain area which included Broadway from the south side of Fourteenth Street on the north to the north side of Seventeenth Street on the south. His car, going south, struck plaintiff on Broadway, and a short distance south of 1316. The place was not in the debit territory, but was near thereto. In an endeavor to show that Nushy, at the time of plaintiff's injury, was on such a mission for the insurance company as would make the company liable for his negligence, plaintiff showed by Mrs. Manning, who resided, at the time, at 1640 Broadway, and in the debit, that Nushy had an appointment with her to be at her home at 7:30 P. M. on day of plaintiff's injury, and that the purpose of the appointment was either to deliver a policy on her life to her, or to take her application for a policy, and Mrs. Manning testified that Nushy came to her house on the day of plaintiff's injury at about 7:30 P. M.

Nushy testified that about 7:30 P. M., and after the accident, he, pursuant to a previous engagement, did call upon Mrs. Manning at 1640 Broadway. Nushy also was not clear as to whether he delivered a policy to Mrs. Manning or took her application. He also said that, when he left home, he intended to call upon Mrs. Manning before he returned. It also appears that he did not deliver the cake that night. Nushy's deposition was taken, and plaintiff introduced a part of this deposition. In the deposition Nushy testified that, after he left Mrs. Manning's he made a collection in his debit that night about 8 o'clock, and then "went straight home." William L. Magoon, manager, in Kansas City, of defendant, insurance company, and a witness for plaintiff, testified that a collection made at night, as it is claimed Nushy made the collection from Mrs. Large, "was within the scope" of Nushy's duty. At the trial Nushy testified that he had checked up on the collection from Mrs. Large and found that he did not make that collection on the night of plaintiff's injury.

█ It appears that the Manning policy was, or was to be, the

ordinary insurance policy, and would not be for attention in Nushy's debit. Under the ruling in Vert v. Metropolitan Life Ins. Co. (enbanc), 342 Mo. 629, 117 S. W. (2d) 252, the defendant, insurance company, would not be liable for any negligence on the part of Nushy while on his way to see Mrs. Manning about an ordinary life insurance policy. In ruling the Vert case, the court said (342 Mo. 629, 117 S. W. (2d) l. c. 256):

"The decisive point is that Crowe (the agent) was not on or returning from a trip which the company had directed him to make, nor which was made for the purpose of performing any duty the company required him to do. The trip was made to carry on another kind of activity which was clearly separate and apart from his regular industrial insurance duties. There should be a clear distinction between an agent who is employed and authorized to bring about only contractual relations between his principal and others on his initiative and by his own methods, and a servant or employee who is employed to perform physical service within the time and in the manner his employer might direct. The American Law Institute's discussion on this rule states: 'The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing only to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results.' [1 Restatement of Agency, Sec. 485.] (Perhaps the term 'right to direct' would express the rule more clearly than 'right to control?' This is true because if there is a right to direct the method, the employer might still be liable although the employee did not use the method directed in the particular instance.") [See, also, Barnes v. Real Silk Hosiery Mills et al., 341 Mo. 563, 108 S. W. (2d) 58.]

It appears, as above stated, that Nushy, in a deposition, testified that he made a collection in his debit on the night of, and about two hours after, plaintiff's injury. Will such evidence, constitute substantial evidence that Nushy did make a collection in his debit that night? In Pulitzer v. Chapman et al. (en banc), 337 Mo. 298, 85 S. W. (2d) 400, there was this question: Should former contradictory statements in a deposition of a witness, not a party, be considered as substantial evidence on an issue. It was contended that prior con-

tradictory statements of a witness, not a party, could be no more than hearsay. Of this the court said (337 Mo. 298, 85 S. W. (2d) l. c. 410): "But how can it be maintained that prior direct statements of fact made by a witness in a deposition taken in the case on trial are hearsay? The witness was under oath when the deposition was given; the litigants on both sides then had opportunity to examine him on the issues; and he confronts the court and both parties may examine him again at the subsequent trial concerning his former statements. This more than meets the requirements of the hearsay rule," citing 3 Wigmore on Evidence (2 Ed.), sec. 1362, p. 3 et seq., sec. 1389, p. 79; State v. Brown, 331 Mo. 556, 560, 56 S. W. (2d) 405, 407; Minea v. St. Louis Cooperage Co., 179 Mo. App. 705, 716, 162 S. W. 741, 744.

After ruling the point in the Pulitzer case the court went on to say: "Some decisions indicate a view that contradictory former statements made by a witness merely tend to show the witness spoke falsely or forgot one time or the other, that is, when he made the former statement or when he gave the testimony contradicted, and for that reason cannot be accepted as proof of the facts stated, but go only to impeachment. That cannot be true, for if it were it would apply to the litigants themselves—and the rule is universal that prior inconsistent statements of a party to an action, by deposition or otherwise, are admissible against him as substantive evidence in the nature of admissions." [See, also, Tate v. Western Union Telegraph Co. et al., 339 Mo. 262, 96 S. W. (2d) 364, l. c. 366; Woelfle v. Conn. Mut. Life Ins. Co. (Mo. App.), 112 S. W. (2d) 865, l. c. 874.]

█ In view of the law as laid down in the Pulitzer case, we hold that Nushy's evidence given in his deposition was substantial evidence tending to show that he did make a collection in his debit on the night of plaintiff's injury, and about two hours thereafter. And for the purpose of the demurrer to the evidence, we take it as established that such collection was made. This brings us to the question: Will the fact that Nushy made a collection in his debit about two hours after plaintiff's injury, support an inference that he, at time of her injury, intended to make such collection, that is, was such collection one of the purposes of Nushy's trip? According to Nushy's evidence, as appears above, he was not on a trip to make the collection when plaintiff was injured. He says that he was then on the way to deliver the cake. Also, he says, as appears, supra, that he checked up and ascertained that he did not make such collection on the night of plaintiff's injury. We have not found any authority directly in point on the question we have here, but we do find the rule on what we think is a somewhat analogous situation. "It is the general rule that proof of a condition or situation at a prior time not too remote raises a presumption of its continued existence thereafter until the contrary is shown, yet such presumptions are not retroactive. They do not run

backwards, and ordinarily proof of a present condition standing alone is not presumptive evidence of its existence theretofore." [Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 31 S. W. (2d) 21, l. c. 26.] It is stated in 22 Corpus Juris., page 92, section 30, that, "as a general rule, proof of the existence of a present condition or state of facts does not raise any presumption that the same condition or facts existed at a prior date." And in 10 Ruling Case Law, page 873, section 15, it is stated that "it is a settled principle of evidence that, as a general rule, presumptions do not run backward."

In the present case we have something more elusive than the existence of a physical condition at the time of plaintiff's injury. It is a state of mind, Nushy's mind, two hours prior to the collection. There is no direct evidence that such collection was one of the purposes of Nushy's trip, and it was the duty of plaintiff to show by the preponderance of the evidence that this collection was one of the purposes of such trip. As to whether or not such collection was his purpose is speculative, whatever else may be said.

"Whether the evidence in a given case is sufficient to support the finding of the jury, when taken and considered in the fashion in which it must be on demurrer, depends on whether it is sufficient to establish with reasonable certainty in the minds of persons of ordinary and average intelligence the existence of the facts on which the finding is necessarily based." [Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311, l. c. 317, and cases there cited.]

In considering a demurrer to the evidence in the Cole case, supra, the court said (340 Mo. 277, 100 S. W. (2d) l. c. 317): "The real questions are whether plaintiff's evidence was sufficient to warrant a finding that there was an unusual accumulation (of dust) (all over the building) sufficient to cause the severe explosion or explosions, which did injure him; and whether this and the spark to ignite it were both due to defendant's negligence? In considering this matter, we recognize the rule that, where the evidence shows that the occurrence which caused plaintiff's injury may have resulted from two or more causes, in order to hold defendant liable, plaintiff must have substantial evidence tending to show that the cause for which defendant would be liable was the actual cause thereof," citing Fryer v. St. L.-S. F. Ry. Co., 333 Mo. 740, 63 S. W. (2d) 47; Strother v. C. B. & Q. Railroad Co. (Mo.), 188 S. W. 1102; Beebe v. St. Louis Transit Co., 206 Mo. 419, 103 S. W. 1019, 12 L. R. A. (N. S.) 760; Fuchs v. St. Louis, 167 Mo. 620, 67 S. W. 610, 57 L. R. A. 130; New York C. Railroad Co. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 562; Penn. Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819.

It is our conclusion and we rule that the fact that Nushy made a collection, in his debit, two hours after plaintiff's injury, will not support an inference that one of the purposes of Nushy's trip that

night was such collection. Reaching this conclusion, we rule that the court should have given the insurance company's demurrer to the evidence at the close of the case. Also, such conclusion makes it unnecessary to consider the case of Riggs v. Higgins et al., 341 Mo. 1, 106 S. W. (2d) 1, which the defendant, insurance company cites.

▉ Did plaintiff make a submissible case as to defendant, Nushy? Stating the facts most favorably for plaintiff it appears that she worked at a garment factory and resided at 1316 Broadway, a north and south street. It was about 115 feet south from the house where plaintiff resided to Fourteenth Street, an east and west street. From curb to curb on Broadway was fifty-four feet. There were north and south street car tracks on Broadway. It was about nineteen feet from the west curb to the west rail of the west (southbound) track, and a like distance from the east curb to the east rail of the east (northbound) track. About 6 P. M. plaintiff started across Broadway from west to east, a short distance south of the place she resided. Her purpose was to deliver a dress at a house on the east side and on the corner of Broadway and Fourteenth. It had snowed, and this, together with rain, according to plaintiff, had caused water to collect in a depression at the intersection of Fourteenth and Broadway, and plaintiff gave this as her reason for not going to the regular crossing place. According to plaintiff there was not "very much" southbound traffic, and no cars were parked on the west side of Broadway at the place where she attempted to cross. When she arrived at about midway of the street and between the two sets of street car tracks, she stopped and stood there "for quite a while," because the northbound traffic "was too thick." Plaintiff said that she was standing there "looking both ways" and that she saw defendant's car approaching from the north. "I seen it kept coming and I couldn't get back to the other side and the line of traffic was going north, I couldn't get through that, and I seen he were coming into me and I threw up my hand. That was the last I knew." She testified that, when she first saw defendant's car approaching, he was as far from her "as from here to the back end of the house." "Q. Could you give the distance in ordinary automobile lengths? A. Well, he was about the distance of three cars from me." Plaintiff testified that there was no car immediately in front or behind defendant's car, and no car or cars to his right.

Defendant testified that there were two lines of southbound traffic; that he was in the second or east line; that his car was "straddling the west rail" of the west street car track; that there were cars in the traffic line he was in, both in his immediate front and to his immediate rear, and cars to his immediate right in the first line of the southbound traffic. Defendant testified that he was driving between fifteen and eighteen miles per hour, and could have stopped in twelve or fifteen feet. On a previous trial, he testified that he could have stopped in three or four feet.

Defendant testified that Broadway was well lighted and that he "could see just as plainly as if it were day light and not raining." And further: "Q. Just tell us what you saw there just preceding the moment of the instant your car came in contact with her. A. Well, as I was driving down Broadway, about—at the point of about 150 feet from 14th street, about seven or eight feet in front of me and to the left I first saw Mrs. Snowwhite taking steps to the front of my car, to the path of my car, and as soon as I saw her I put on my brakes instantly and I couldn't turn to the right and I couldn't turn to the left, and the only thing I could do was stop, and that is what I did, just as quick as I could. Q. Now, you said you saw Mrs. Snowwhite taking steps toward your car. Which way was she moving? A. She was moving toward the west from the center of Broadway, from approximately between the two tracks, she was moving directly into the path of my car. Q. And was your car still going down the, straddle the west rail at that time? A. My car was straddle of the west rail. Q. How far ahead of you, you say this lady was, and to the left of you, when you saw her moving towards the path of your car? A. She was about seven or eight feet ahead of me, to the left. Q. Did she continue to move toward the west and toward the path of your car? A. Yes. Q. Did your car come in contact with her? A. Yes, it did. Q. Just tell these gentlemen in your own way what part of your automobile came in contact with Mrs. Snowwhite. A. The left side of the left front fender."

Defendant contends that plaintiff's evidence on direct examination was completely nullified by the cross-examination, and that, in effect, there was no evidence of a substantial nature, except that of the defendant which, according to the contention, conclusively showed that plaintiff's injuries were caused *solely* by her own negligence. It is true that plaintiff, on cross-examination, made statements somewhat contradictory of her direct evidence. Example: On direct examination she said that when she first saw defendant's car it was about three car lengths away. On cross-examination her attention was called to evidence at a former trial when she placed the distance at about 15 feet, and then she was asked: "Q. And that is the truth, isn't it? A. Well, I guess so, yes." Apparently defendant proceeds on the theory that it must be accepted that plaintiff's evidence is that when she first saw the car it was fifteen feet away, and that there was no evidence as to stopping distance except that given by him at the last trial, viz.: That he could have stopped in twelve or fifteen feet. But if defendant could have stopped and had stopped in twelve feet, he would not have struck plaintiff. Also, it must not be overlooked that at the former trial defendant testified that he could have stopped his car in three or four feet.

Clearly, we think, Nushy's demurrer to the evidence, at the close of the whole case, was properly refused.

Instruction, L, above mentioned, follows: "The court instructs the jury that the charge laid by plaintiff against the defendants is one of negligence. Negligence is a positive wrong, and therefore, in this case is not presumed. In other words, a recovery may be had on a charge of negligence only when such charge is sustained by the preponderance, that is, the greater weight of the credible evidence to the reasonable satisfaction of the jury that the charge is true as laid, and it does not devolve upon the defendants to disprove the charge, but rather, the law casts the burden of proof in this respect upon the plaintiff. If, therefore, you find the evidence touching the charge of negligence against the defendants to be evenly balanced, that is, if the truth as to the charge of negligence against the defendants remains undetermined in your minds, after fairly considering the evidence, then your verdict must be for the defendants."

An instruction, identical in effect, with Instruction L was condemned in Nelson v. Evans, 338 Mo. 991, 93 S. W. (2d) 691. Many cases were cited. Defendant attempts to distinguish the present instruction from the condemned instruction in the Nelson case. There is no distinction, and we rule that the action of the trial court in granting a new trial, because of the giving of Instruction L, was proper.

The order and judgment granting a new trial as to defendant, Metropolitan Life Insurance Company, should be reversed, and cause remanded with direction to set aside the order granting a new trial as to the insurance company, reinstate the verdict as to the insurance company, and enter judgment on the verdict for the insurance company. As to defendant, Nushy, the order and judgment granting a new trial should be affirmed, and the cause remanded for retrial as to defendant, Nushy. All of which is so ordered. *Hyde, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.